Andrew **BACKO**, Mike Karaman, Casmir Macko, James Barno and Ercell Cummings, Plaintiffs-Appellees,

v.

**LOCAL 281, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA,** Rudy Colton, Individually and as President of Local 281, Duane Kane, Individually and as Vice President of Local 281, Defendants-Appellants,

and

Ervin B. Lambert, Defendant-Appellant.

**UNITED STATES** of America, Plaintiffs-Appellees,

v.

Rudy **COLTON** and Ervin B. Lambert, Defendants-Appellants.

Nos. 76–80, Dockets 34771–34775.

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1970.

Decided Dec. 29, 1970.

Thomas P. McMahon, Buffalo, N. Y. (McMahon & Crotty, Buffalo, N. Y., of counsel), for Local 281 and Ervin B. Lambert, defendants-appellants.

Stephen J. Pawlinga, Utica, N. Y., on the joint brief for Rudy Colton and Duane Kane as defendants-appellants.

Angelos Peter Romas, Endicott, N. Y., for plaintiffs-appellees in civil contempts and for United States of America, plaintiff-appellee in criminal contempt.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal brought by defendants Ervin B. Lambert, Duane Kane, Rudy Colton and Local 281, United Brotherhood of Carpenters and Joiners of America, A.F.L.-C.I.O. (the Union) from the judgment of civil contempt entered against them on January 29, 1970 and by Ervin B. Lambert and Rudy Colton from the judgment of criminal contempt entered against them on December 31, 1969.

The dispute which led to the contempt judgment arose out of a Union election. Plaintiffs were candidates for elective office in Local 281. The election was to be held on June 6, 1968. Pursuant to Section 401(c) of the Labor Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 481) (the Act), plaintiffs made a request that the Union distribute campaign literature by mail at the candidates' expense. The Union refused on the grounds that the material contained allegations which were incorrect. Julius Amadio, acting as the Union's Election Committee chairman, made this known to plaintiffs in a letter dated June 3, 1968. It was not until the morning of June 6th that plaintiffs decided to bring this action. Plaintiffs presented a complaint and a proposed "Order to Show Cause and Temporary Restraining Order" to Judge Edmund Port at his chambers in Auburn, New York. The testimony is unclear as to exactly what Judge Port did with the complaint. However, on the complaint as well as on the show cause order and temporary restraining order which Judge Port signed, it is noted on the top left in ink: "Filed 6/6/68, [at] 10:33 A.M. at Auburn, New York [signed] E. Port, U.S.D.J." The docket entry of the Clerk states that a summons and complaint was filed on June 6, 1968. This constitutes prima facie evidence that the complaint was filed by Judge Port at the time noted and there is nothing in this record to rebut that fact. Judge Port signed the order to show cause and temporary restraining order and it was served on defendant Rudy Colton, the Union president, at the hall where the election was about to be held in Binghamton, N. Y. According to a docket entry dated June 18th, the return of service indicated that along with the Order to Show Cause and Temporary Restraining Order, a copy of the complaint was also served. Although the testimony of plaintiffs' lawyer, Angelos Peter Romas, as to the exact papers served on Colton is vague and does not specifically indicate that the complaint was included therein, we again find no evidence to the contrary and conclude that the docket entry was accurate, and that the time of such service was, as indicated in the testimony of the plaintiffs' witnesses, namely, just prior to the start of the meeting at 1:00 P.M.

Meanwhile, between 11:30 and 12:00 that morning, Judge Port made a telephone call to Colton's office. He spoke

to Mrs. Betty Wilke, a secretary at the office of Local 281 in Binghamton, New York. Judge Port informed Mrs. Wilke of the order he had just signed, and requested that either Colton or Lambert return his call. This was not done, although Lambert was given the message at 12:30, which message Lambert said he considered "unimportant." At 1:00 P.M. when Colton was served, Lambert was standing next to him. Mr. Romas told Colton that he was deputized by Judge Port to serve the order. Lambert told Colton that he should put the paper in his pocket and talk to the lawyers later. Later that evening, copies of the papers were also served on the defendant Duane Kane. This was at 7:30 P.M. before the polls had closed. In addition to Kane, vice-president of the Union and member of the election committee, other members of said committee not involved in this appeal were also served. The testimony was that all of them treated the papers as "a big joke."

The election was held as scheduled despite the Temporary Restraining Order which prohibited the holding of the election. Neither Colton nor Lambert were on the election committee but they did and still do hold the two most important positions in the Union: President and Business Manager, respectively. Defendants claimed they had no power to stop the election but the jury obviously found otherwise.

On June 12 and 13, 1968, a hearing was held on the Order to Show Cause why a preliminary injunction should not be granted. Judge Port nullified the election, and ordered that a new election be held on June 27th and that plaintiffs' literature be distributed by the Union. The defendants did not appeal that decision. The election was held and the plaintiffs' slate was defeated.

That settled the question of who was to run the Union, but did not end the litigation. Contempt proceedings were begun by order to show cause and after the issuance of a "Second Amended Order to Show Cause" on September 3,

1968, returnable September 23, 1968, a preliminary hearing was held. Subsequently, on July 23, 1969, Judge Port appointed attorney Romas as Attorney for the United States of America, *nunc pro tunc* for the purpose of prosecuting defendants for criminal contempt. It soon became clear that both civil and criminal contempt judgments were being sought. Separate trials were held by Judge Lloyd F. MacMahon for the criminal and civil complaints. The criminal trial came first and the same jury was used in both cases. The record in the civil contempt includes the record from the criminal side, a practice which seems appropriate since the same facts and fact finders were present in both cases.

Defendants make numerous allegations of error, which we will now discuss.

## I.

### *Existence of the Writ*

It is contended that there was no sufficient proof that a valid restraining order was issued, although the order was introduced into evidence. The issuance of the writ was the subject of testimony by plaintiffs' lawyer, Romas, but it is argued that such testimony must be disregarded since Romas, as the prosecutor in the criminal contempt, should not have testified. United States v. Alu, 246 F.2d 29, 33-34 (2d Cir. 1957). However, this is not an absolute rule, and special circumstances will justify testimony by the prosecution. United States v. Socony Vacuum Oil Company, 310 U.S. 150, 240-242, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Greenberg v. United States, 280 F.2d 472, 475 (1st Cir. 1960). Here where Romas had co-counsel present the summation in both trials, where he was appointed *nunc pro tunc*, and where the basic items to which he testified were jurisdictional prerequisites, most of which were solely within his knowledge and the knowledge of Judge Port, the testimony was proper. In any event, the docket entry referring to the writ is prima facie evidence of its

existence, and such prima facie showing has not been rebutted. Defendants' contention that there can be no writ without the seal of the Court is without merit.

## II.

### Validity of the Writ

■ Defendants' next set of contentions relates to the jurisdiction of the Court in relation to the issuance of the Temporary Restraining Order. It is first suggested that the Court was without jurisdiction to issue such order because no action had been commenced. However, a complaint was filed at the same time, thereby commencing the action and giving the Court jurisdiction to issue the order.

■■ In order to enforce rights of Union members with respect to a Union election, the election may be enjoined by a temporary restraining order. Calhoon v. Harvey, 379 U.S. 134, 140 n. 13, 85 S. Ct. 292, 13 L.Ed.2d 190 (1964); Sheridan v. United Brotherhood of Carpenters, etc., 194 F.Supp. 664 (D.Del.1961), rev'd on other grounds, 306 F.2d 152 (3d Cir. 1962). While it may be that under certain circumstances the possibility of post-election relief will prevent a finding of irreparable injury, we cannot say that the District Court was clearly erroneous in its assumption that irreparable injury would have resulted in this case had the Temporary Restraining Order not been granted.

■ Defendants also argue that the Court had not obtained *in personam* jurisdiction over anyone at the time of the service of the show cause order and temporary restraining order. Although normally a summons must be issued and served in order to obtain *in personam* jurisdiction, here *in personam* jurisdiction was obtained by the service of the Temporary Restraining Order and complaint. The parties were in Auburn, New York where there was no court Clerk, and since the Clerk is designated as the proper person to issue a summons, Fed.R.Civ.P. 4 (b), it is clear that Judge Port felt it best

to advise plaintiffs to use the order itself to obtain jurisdiction over the persons to whom the order was addressed. Where an order and complaint are properly served on an individual, he is placed within the jurisdiction of the Court for the purposes of that order. Cf. Jacobson v. Coon et al. (National Bank of Detroit), 165 F.2d 565, 567 (6th Cir. 1948). Although the form of the order, naming only the Union "et al." may have left others in doubt as to whether they were parties in the civil action which had just been commenced, it is unnecessary to decide whether this caption precludes a finding that jurisdiction was obtained over one or more of the individual defendants, since they are responsible in any event, as agents of defendant Union who were on notice as to the contents of the order. As Judge Learned Hand said in Alemite Mfg. Corporation v. Staff, 42 F.2d 832 (2d Cir. 1930):

"* * * a person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt. This is well settled law."

## III.

### Disobedience of the Order

■ The individual defendants argue that they cannot be held in contempt because there was no disobedience of the order by the individual defendants. However, the Union was brought under the jurisdiction of the Court when the order was served on its president, Colton, and its servants who had notice of said order were under a duty to obey the order. There is no doubt that all three had such knowledge since two were personally served with the order and the other, Lambert, had a message from Judge Port regarding the order and was standing next to Colton when he was served. Lambert, Colton and Kane held positions in the Union which suggested prima facie that they had power to effect compliance with the order. To be held liable in contempt, it is necessary that a non-party respondent

"must either abet the defendant, or must be legally identified with him" (as here). Alemite Mfg. Corporation v. Staff, *supra*, 42 F.2d at 833. Furthermore, all three individual defendants affirmatively caused the order to be violated, in that they clearly evidenced a desire that the order should be disregarded. Kane did this by treating the order with which he was served as a "big joke" and Lambert and Colton evidenced a similar attitude when Colton, on instructions from Lambert, put the Order in his back pocket apparently without reading it. The jury evidently concluded that defendants did violate the order, a finding which we cannot say was not based on supporting proof.[1]

## IV.

### *The Criminal Contempt*

Defendants challenge the procedure on the trial for criminal contempt. Criminal contempt is to be punished in accordance with Fed.R.Crim.P. 42. Since the action here was not committed in the presence of the Judge, the applicable section is 42(b). This rule states:

> "A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation for the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or * * * of an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an Act of Congress so provides. * * *"

The Second Amended Order to Show Cause, relied on by plaintiffs, does not by itself comply with the above quoted rule. The persons to be cited were named as "Ervin B. Lambert and the defendants." The "defendants" clearly included Colton who had appeared in the June 13th trial as a named defendant in the original complaint. The order set forth "the essential facts constituting the criminal conduct," that being the disobedience of the order. United States v. United Mine Workers, 330 U.S. 258, 297, 67 S.Ct. 677, at 697, 91 L.Ed. 884 (1947) held that formal notice that the contempt will be criminal in nature may be dispensed with where no substantial prejudice results. Here, at the time of the service of the Second Amended Order to Show Cause, it is clear that even attorney Romas was unsure whether he desired to characterize this action as criminal or civil or both.[2] As time went on, however, Romas decided it was to be both. Judge Port's order appointing Romas as special government prosecutor confirmed that criminal contempt was involved. A letter from attorney McMahon dated August 8, 1969 showed that by that time, he was fully aware that a criminal as well as civil contempt was to be prosecuted. Assuming that McMahon was representing both Colton and Lambert, we think that this evidence of his being notified satisfies the requirements of Rule 42(b), and the evidence shows that Lambert and Colton were in fact represented by McMahon both before and during the trial for criminal contempt. In a letter dated September 19, 1968, McMahon stated that he was "retained as counsel in the matter." At the preliminary hearing on September 23, 1968, the Court asked McMahon, "[Do] you appear for him [Lambert]?" The reply was, "I do." Lambert at that time sat in the Court

---

1. Since we find that defendants affirmatively took action which prevented the order from being obeyed, it is not necessary to consider whether they would have been equally liable or guilty if only passive action was involved.

2. At the hearing on September 23d, Romas' indecision as to the nature of the contempt was finally met by the rejoinder of Judge Port, "All right. Both of you will need time to brief it."

Room and did not in any way contradict this statment. Colton was also present at that time, and did not object when McMahon, the only lawyer present on behalf of the defense, stated, "The defendants are prepared" (emphasis supplied). The record also shows that both were present at the contempt trial.

Any defect in the mode of compliance with Fed.R.Crim.P. 42(b) was waived by defendant when no motion was made until after the jury was picked and the opening statements were completed. Fed.R.Crim.P. 12(b) (2) and (3). Pon v. United States, 168 F.2d 373 (1st Cir. 1948). Nor were defendants denied counsel since McMahon in fact ably represented them at all critical stages of the proceedings.

## V.

### The Civil Contempt

■■ Jurisdiction was obtained in the civil contempt because of the presence of all defendants at trial, the failure to interpose proper objection as required by Fed.R.Civ.P. 12(h) (1) and in the case of defendants other than Lambert, jurisdiction was obtained when they appeared in connection with the trial of June 12 and 13, 1968, since the civil contempt was, in effect, a continuation of that case.

■■ For the first time on appeal, defendants suggest that the civil contempt was improper because final judgment had been rendered as to the original complaint, and the injunction, requiring that plaintiffs' literature was to be distributed under certain conditions, and requiring that the election be held on June 28, 1968 was not disobeyed.

This contention results from a failure properly to differentiate between civil contempt of a coercive nature and civil contempt of a compensatory nature. Where a civil contempt proceeding is coercive in nature and seeks to enforce an interlocutory order, it abates when the proceedings out of which it arises are terminated. Shillitani v. United States, 384 U.S. 364, 370, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); F.T.C. v. Stroiman, 428 F.2d 808 (8th Cir. 1970); Harris v. Texas and Pacific Ry., 196 F. 2d 88 (7th Cir. 1952); De Parcq v. United States District Court, 235 F.2d 692, 697 (8th Cir. 1956). No such rule applies to purely compensatory civil contempt judgments.[3] This principle is illustrated in Parker v. United States, 135 F.2d 54 (1st Cir. 1943), cert. denied 320 U.S. 737, 64 S.Ct. 35, 88 L.Ed. 436 (1943), where the court found the defendant liable, in a postjudgment civil contempt proceeding for damages due to disobedience of both an interlocutory and final order. See also Vincent v. Local 294, International Brotherhood of Teamsters etc., 424 F.2d 124, 129 (2d Cir. 1970);[4] but see Pacific Gamble Robinson v. Minneapolis and St. Louis Ry. Co., 92 F.Supp. 352 (D.Minn.1950).

■■ The damage award was civil in nature and included compensation for certain extra expenses to which plaintiffs were put because of the disobedience of the temporary restraining order, for the period subsequent to the final judgment filed on June 17, 1968, including the cost of prosecuting the contempt. These were proper items for compensation. Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 426–428, 43 S.Ct. 458, 67 L.Ed. 719 (1933);

3. When the parties choose to effect an out-of-court settlement of a case, unless the settlement specifically states otherwise, all elements of that litigation are deemed settled, including any right to seek a compensatory civil contempt judgment. Gompers v. Buck's Stove and Range Company, 221 U.S. 418, 451, 31 S.Ct. 492, 55 L.Ed. 797 (1911). A final judgment in a case does not "settle" a right to sue for contempt, at least with respect to damages incurred after the date of the final judgment, unless the judgment so states.

4. In that case, it was found that the sanction for civil contempt abated with the expiration of the injunction which was being disobeyed "[s]ince the *sole* purpose of the civil contempt order was to *compel compliance* with the injunction order" (emphasis supplied).

Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Lichtenstein v. Lichtenstein, 425 F.2d 1111 (3d Cir.1970); N.L.R.B. v. Local 825, International Union of Operating Engineers, 430 F.2d 1225 (3d Cir. 1970).[5]

## VI.

### *Conclusion*

We have considered defendants' other contentions and conclude they are without merit. The judgments in both the civil and criminal contempts are affirmed. In the exercise of our discretion, we deny plaintiffs' request for counsel fees on appeal.

5. We do not think that plaintiffs are entitled to compensation for the services of their attorney in his capacity as prosecutor for the United States, *nunc pro tunc.* Of course, in a proper case, compensation might be paid to the attorney himself, for services in this capacity, from the fines collected by the government from the defendants in the criminal contempt. No such fines were levied here. We note that the jury clearly omitted this item from its computation of damages in the civil contempt, and as such, we feel that the Court's charge indicating this to be a proper item of damages in the civil case to be harmless error.