In re KEENE CORPORATION, Debtor,

KEENE CORPORATION, Plaintiff,

v.

ACSTAR INSURANCE CO.,
et al., Defendants.

KEENE CORPORATION, Petitioner,

v.

LEVY, PHILLIPS & KONIGSBERG, Stanley J. Levy, Robert I. Komitor, Moishe Maimon, Brookman, Rosenberg, Brown & Sandler and Steven J. Cooperstein, Respondents.

Bankruptcy No. 93 B 46090 (SMB).
Adv. No. 93–9987A.

United States Bankruptcy Court,
S.D. New York.

May 27, 1994.

Berlack Israels & Liberman, New York City, for debtor Keene Corp.; Edward S. Weisfelner, Carole Fern, of counsel.

Levy Phillips & Konigsberg, pro se, New York City, for respondents Stanley J. Levy, Robert I. Komitor and Moishe Maimon; Steven J. Phillips, Stanley J. Levy, of counsel.

## MEMORANDUM DECISION DENYING MOTION TO DISMISS CLAIMS BASED ON COMPENSATORY CIVIL CONTEMPT

STUART M. BERNSTEIN, Bankruptcy Judge.

The Debtor, Keene Corporation ("Keene"), seeks an order of civil contempt and an award of damages against Levy Phillips & Konigsberg ("LP & K"), a law firm that represents numerous asbestos injury claimants, and two of its partners, Stanley J. Levy and Moishe Maimon, on account of their disobedience of this Court's temporary restraining order (the "TRO"), dated December 6, 1993 (the "Contempt Motion").[1] After Keene commenced the Contempt Motion, the Court vacated the TRO, and denied Keene's motion for a preliminary injunction. *Keene Corp. v. Acstar Insur. Co. (In re Keene Corp.)*, 162 B.R. 935 (Bankr.S.D.N.Y.1994).

Keene nonetheless continued to prosecute the Contempt Motion, and the Court commenced an evidentiary hearing. Midway through the evidentiary hearing, and for the first time, LP & K asserted that the vacatur of the TRO mandated the denial of the Contempt Motion as a matter of law. Treating LP & K's argument as an application to dismiss the Contempt Motion for legal insufficiency, the Court received additional memoranda and heard extensive oral argument from the parties. The issue raised by LP & K's application is somewhat novel, and after due deliberation, the Court concludes that the vacatur of the TRO does not, *ipso jure*, require the denial of the Contempt Motion.

### THE FACTS [2]

On December 3, 1993, Keene commenced this Chapter 11 case, and on December 6, 1993, initiated this adversary proceeding. It sought to prevent collection activities against

---

1. The Court previously denied the Contempt Motion against Brookman, Rosenberg, Brown & Sandler and Steven J. Cooperstein, and Keene withdrew the motion against Robert I. Komitor.

2. As LP & K's application is being treated as a motion to dismiss Keene's Contempt Motion for legal insufficiency, the Court views the facts in the light most favorable to Keene.

escrows and supersedeas bonds procured by Keene to stay enforcement of certain judgments pending Keene's appeals from those judgments. Keene also sought to prevent the sureties that had supplied the bonds from drawing on the standby letters of credit that backed the supersedeas bonds and were collateralized by Keene's assets. A more complete description of the background leading to the filing of the petition as well as Keene's request for injunctive relief is set forth in *Keene Corp. v. Acstar*, 162 B.R. 935.

At the time it commenced the adversary proceeding, Keene also sought a temporary restraining order. On December 6, 1993, the Court heard oral argument in support of and in opposition to Keene's request for immediate, emergency relief. Stanley J. Levy, Esq., a partner in LP & K and a Respondent on the Contempt Motion, argued strongly against its issuance. LP & K represents many claimants with asbestos related injuries, including many holding final judgments, and this latter group of claimants were entitled, under the terms of the supersedeas bonds and escrows, to enforce their judgments against the sureties or escrow agents. Hence, LP & K represented a group of creditors immediately and severely affected by the issuance of even a temporary stay.

At the conclusion of the hearing, the Court granted Keene's application for an immediate stay pending an evidentiary hearing on its application for a preliminary injunction. The terms of the stay, announced in open Court and thereafter memorialized in the TRO, temporarily stayed the release, transfer or impairment, *inter alia*, of assets Keene posted in connection with the aforementioned escrow accounts.[3] Mr. Levy was present in Court when the terms of the stay were announced.

To put the Contempt Motion in context, the Court must step back several days. On December 1, 1993, the United States Court of Appeals for the Second Circuit dismissed what has been termed Keene's Limited Fund Action in which it sought to affect a non-bankruptcy, judicial workout. *See Keene*

*Corp. v. Fiorelli*, 14 F.3d 726 (2d Cir.1993). During the pendency of the Limited Fund Action, a stay similar in terms to the TRO had been in effect, and the dismissal of the Limited Fund Action terminated that stay. Immediately following the issuance of the Second Circuit's decision, LP & K communicated with the escrow agents and Keene's attorneys with the aim of releasing the escrows that secured final judgments. Due to a dispute regarding the impact of the Second Circuit's decision on the existing stay, Keene refused to take the necessary steps to release the escrows, and advised the escrow agents of Keene's position that the escrows should not be released.

On December 3, 1993, at the same time that Keene was preparing to file its Chapter 11 petition, members of LP & K, including Mr. Levy, were meeting to plan their next step. They decided to move in state court to compel the release of the escrows, and to commence civil actions in federal court against Keene's lawyers and the escrow agents for the same purpose. On December 3, 1993, LP & K procured an order to show cause from State Supreme Court Justice Helen Freedman, returnable on the afternoon of December 9, seeking an order directing the release of certain of the escrows. That order to show cause contained errors that were corrected on December 6 by a second order to show cause, still returnable on December 9. The procurement of these state court orders to show cause is not alleged to be contemptuous; what followed is.

One day after the TRO issued, and without any notice to Keene, LP & K filed two complaints, one against Citibank, N.A., the escrow agent, and the other against Keene's lawyers, in the United States District Court for the Eastern District of New York. Simultaneously with the commencement of these actions, LP & K submitted an order to show cause that sought to compel Citibank to immediately release the escrow funds, and to compel Keene's lawyers, McCarter & English and Richard P. O'Leary, Esq., to take the necessary steps "to effect the immediate

---

3. The TRO also stayed enforcement activities in connection with the supersedeas bonds and standby letters of credit. This aspect of the TRO, however, is not germane to the Contempt Motion.

release of said funds". Senior District Judge Jack B. Weinstein, to whom the cases were assigned, signed the order to show cause, and scheduled the return date for the morning of December 9.

As soon as Keene's bankruptcy counsel learned of the federal lawsuits and the impending state and federal court motions, they took steps to protect Keene's interests. In addition to communicating with McCarter & English, bankruptcy counsel attended the federal and state court proceedings on December 9. At the federal court hearing, Judge Weinstein granted the defendants' oral motions to dismiss the federal actions which, in effect, left the matter with this Court. Later that same day, the state court determined that no state court impediment prevented the release of the escrows, but deferred to this Court on the ultimate issue of whether the escrows should be released.

The Court assumes, for the purposes of LP & K's motion to dismiss, that the acts of LP & K and Messrs. Levy and Maimon, the latter being the LP & K partner directly responsible for the commencement of the federal actions and the procurement of the federal court order to show cause, were in contempt of this Court's TRO, and that Keene incurred damages, including primarily legal fees, in responding to both orders to show cause.

On January 4, 1994, and after a three day evidentiary hearing, this Court issued its decision denying Keene's motion for a preliminary injunction. *Keene Corp. v. Acstar*, 162 B.R. 935. As the TRO had been issued to maintain the status quo pending the decision on that motion, the Court vacated the TRO. *Id.* at 938. With regard to the escrows, the Court concluded that the automatic stay did not prevent their release to satisfy final judgments because the escrows securing the final judgments were no longer property of the estate, and that the enforcement of the claims against the escrow agents did not constitute actions against Keene. *Id.* at 943. In addition, the Court ruled that Keene had failed—after a three day evidentiary hearing—to prove that it was entitled to a preliminary injunction under 11 U.S.C. § 105. 162 B.R. at 944–49.

## DISCUSSION

### A. Introduction

■ One who disobeys a valid court order subjects himself to both civil and criminal contempt penalties for the same act. *New York State National Organization for Women v. Terry*, 697 F.Supp. 1324, 1329 (S.D.N.Y. 1988). The offending party's conduct is not the primary factor that dictates the nature of the contempt. *Latrobe Steel Co. v. United Steelworkers of America, AFL–CIO*, 545 F.2d 1336, 1343 (3d Cir.1976). Rather, the purpose and character of the sanctions that are sought are determinative. *Shillitani v. United States*, 384 U.S. 364, 369, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966).

■ The Third Circuit, in *Latrobe Steel*, succinctly summarized the distinction between the two types of contempt:

> The purpose of criminal contempt is to vindicate the authority of the court. Criminal contempt seeks to punish past acts of disobedience and may be maintained only with court approval. Its proceedings are separate from the actions which spawned them. If a criminal contempt action develops from a civil proceeding, it bears a separate caption apart from the civil suit. And the penalties arising out of the adjudications of criminal contempt are generally an absolute fine of a specific amount or a determinate period of confinement.... On the other hand, the objective of a civil contempt decree is to benefit the complainant. Civil contempt proceedings are instituted primarily on the motion of the plaintiff and are part of the underlying action.

545 F.2d at 1343–1344 (footnotes and citations omitted); *accord, Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 399 (5th Cir.1987).

■ Civil contempt proceedings can be coercive or compensatory. Coercive civil contempt imposes sanctions, such as fines or imprisonment, to compel compliance with the court's orders; compensatory civil contempt attempts to indemnify the injured party for the damage caused by the contempt. *Coleman v. Espy*, 986 F.2d 1184, 1190 (8th Cir.),

*cert. denied,* —— U.S. ——, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993).

█ The Contempt Motion is purely civil and purely compensatory[4]. Keene seeks to be compensated for the legal fees and other expenses it incurred in fending off the allegedly contemptuous acts of trying to collect the escrows after the TRO issued and before it was vacated.

## B. The Termination of the Underlying Order

█ As a rule, one who violates a valid interlocutory order, which subsequently terminates due to passage of time or mootness, is nonetheless liable as a civil contemnor for damages caused by his disobedience. Although a claim based on coercive civil contempt terminates with the underlying order, a damage claim based on civil contempt remains viable. The rationale for this distinction, and the continuing viability of the compensatory damage claim, was explained in *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d at 400:

> If the civil contempt proceeding is coercive in nature, the general rule is that it is mooted when the proceeding out of which it arises is terminated. *See Shillitani,* 384 U.S. at 371, 86 S.Ct. at 1536; *Howell v. Jones,* 516 F.2d 53, 56 (5th Cir.1975). If, however, the civil contempt proceeding is compensatory in nature, the termination of the underlying action out of which the contempt hearing arose does not moot the contempt proceeding. See *Backo v. Local 281, United Brotherhood of Carpenters & Joiners,* 438 F.2d 176, 182 (2d Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1970); *see also People's Housing Development Corp. v. City of Poughkeepsie,* 425 F.Supp. 482, 495 (S.D.N.Y. 1976) ("There is a vital distinction between coercive contempt proceedings, which do not survive the abatement of the original actions out of which they arise, and compensatory contempt proceedings, which do

survive."). This distinction rests upon the fact that the harm or injury that gives rise to the need for compensation continues unredressed at the end of the underlying litigation while the need for getting a party to act in the underlying litigation necessarily terminates when that litigation ends. *Accord Coleman v. Espy,* 986 F.2d at 1188 (compensatory civil contempt claim not affected where underlying injunction abated by a subsequent change in legislation); *Klett v. Pim,* 965 F.2d 587, 590 (8th Cir.1992) (same); *Backo v. Local 281, United Brotherhood of Carpenters & Joiners,* 438 F.2d 176, 182 (2d Cir.1970) (compensatory civil contempt claim not affected by lapse of order and termination of underlying action), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971); *United States v. Tivian Laboratories, Inc.,* 1981 WL 1774 (D.R.I.) (although the inability to comply with the coercive document production order mandated the respondent's release from imprisonment, it did not vitiate the original order and the costs incurred by the government to obtain documents); *but see Collins v. Barry,* 841 F.2d 1297, 1300 (6th Cir.) (reversing civil contempt against Ohio official for violating injunction against denying welfare benefits where subsequent legislation mandated denial of benefits), *cert. denied,* 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 52 (1988).

█ There is, however, a well recognized exception to the rule, and the Respondents invoke it in this case. If the underlying order is vacated or reversed because it was erroneous or the issuing court lacked subject matter jurisdiction, the civil contempt must be dismissed. For example, in *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 86 F.2d 727 (2d Cir.1936), the defendant appealed from an order of civil contempt arising from its disobedience of a preliminary injunction issued by the district court in a patent infringement action. Having reversed the preliminary injunction in a companion case, *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 86 F.2d

---

**4.** Coercive civil contempt terminates once the underlying order terminates for any reason. *Shillitani v. United States,* 384 U.S. at 370, 86 S.Ct. at 1535; *Backo v. Local 281, United Brotherhood of Carpenters & Joiners of America,* 438

F.2d 176, 182 (2d Cir.1970), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971). Since the TRO has been vacated, Keene cannot assert a claim based on coercive civil contempt.

725 (2d Cir.1936), the Court of Appeals ruled that the civil contempt must also be reversed:

A conviction for criminal contempt may indeed survive the reversal of the decree disobeyed; the punishment is to vindicate the court's authority which has been equally flouted whether or not the command was right. But the same cannot be true of civil contempts, which are only remedial. It is true that the reversal of the decree does not retroactively obliterate the past existence of the violation; yet on the other hand it does more than destroy the future sanction of the decree. It adjudges that it never should have passed; that the right which it affected to create was no right at all. To let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong, which the law should not do.

86 F.2d at 727.

The Supreme Court of the United States cited *Salvage Process* in the seminal case of *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). After taking over the coal mines, the Government entered into an agreement (the "Agreement") with John L. Lewis, as president of the United Mine Workers of America, governing the terms and conditions of employment in the mines. Lewis requested a conference with the Government to renegotiate the Agreement, but when the parties reached an impasse, Lewis purported to terminate the Agreement unilaterally.

The Government then filed a suit against the United Mine Workers and Lewis, and fearing a strike, obtained an *ex parte* temporary order that restrained the defendants from encouraging interference with the operations of the mines by strike or cessation of work, and from taking any action that would interfere with the court's jurisdiction and its determination of the case. *Id.* at 266–67, 67 S.Ct. at 682–83. The order was to expire, by its own terms, nine days later, when the court had scheduled a hearing on the Government's motion for a preliminary injunction.

On the same day that the temporary stay was issued and served on the defendants, a gradual walkout by miners began. Three days later, the Government commenced contempt proceedings against the defendants, alleging that they willfully violated the restraining order. The Court rejected the defendants' argument that the district court lacked jurisdiction to issue the restraining order, and found the defendants guilty of both criminal and civil contempt. *Id.* at 269, 67 S.Ct. at 684.

The principal issue raised by the defendants before the Supreme Court concerned the power of the district court to issue an injunction in light of the anti-injunction provisions contained in the Norris–LaGuardia Act. *Id.* at 267–68, 67 S.Ct. at 682–84. After holding that the Norris–LaGuardia Act did not apply, *Id.* at 289, 67 S.Ct. at 684, the Court concluded that alternative grounds supported the district court's power to punish violations of its orders as *criminal* contempt. If a court of competent jurisdiction issues an injunction, its order must be obeyed unless reversed for error by itself or by a higher court, and disobedience of the order is a criminal contempt. *Id.* at 294, 67 S.Ct. at 696 (quoting *Howat v. Kansas*, 258 U.S. 181, 189, 42 S.Ct. 277, 280–81, 66 L.Ed. 550 (1922)).

In *dicta*, the Supreme Court distinguished between criminal and civil contempt, concluding that the right to the civil remedy falls when the injunction is reversed because it is erroneously issued or beyond the jurisdiction of the issuing Court:

It does not follow, of course, that simply because a defendant may be punished for criminal contempt for disobedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued, and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court. Nor does the reason underlying *United States v. Shipp*, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906) *supra*, compel a different result. If the Norris–LaGuardia Act were applicable in this case,

the conviction for civil contempt would be reversed in its entirety.

330 U.S. at 294–95, 67 S.Ct. at 696–97 (citations and footnote omitted).

■ As noted, *United Mine Workers* is the seminal contempt case in American jurisprudence, and despite being *dicta*, its discussion of civil contempt is the principal authority on the effect of the reversal of an erroneous order. It is, therefore, beyond cavil that the claim for civil contempt must fall if the order that was disobeyed is subsequently reversed by the issuing court or the appellate court, or its issuance exceeded the power of the issuing court. *See, e.g., McLean v. Central States, Southeast and Southwest Areas Pension Fund (In re McLean)*, 762 F.2d 1204, 1210 (4th Cir.1985) (civil contempt invalidated by reversal of order erroneously directing pension payments to Chapter 13 trustee); *National Maritime Union v. Aqua-Slide 'N' Dive Corp.*, 737 F.2d 1395, 1400 (5th Cir.1984) (award of damages for violation of preliminary injunction fell because district court lacked jurisdiction to issue the injunction); *Buffalo Courier Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59–80 (2d Cir.1979) (civil contempt order could not stand where temporary restraining order reversed due to legal and factual error, and preliminary injunction vacated); *Latrobe Steel Co. v. United Steel Workers*, 545 F.2d at 1348 (district court exceeded its jurisdiction in issuing preliminary injunction); *Heyman v. Kline*, 456 F.2d 123, 131 (2d Cir.) (temporary restraining order to prevent lawsuits affecting property erroneously issued because District Court did not have *in rem* jurisdiction over property), *cert. denied*, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); *Pan Am Corp. v. Delta Airlines (In re Pan Am Corp.)*, 161 B.R. 577, 586 (S.D.N.Y.1993) (coercive civil contempt order reversed on appeal where underlying order improperly required disclosure of information); *but see People's Housing Development Corp. v. Poughkeepsie*, 425 F.Supp. 482, 495 (S.D.N.Y.1976) (compensatory civil contempt claims survive dismissal of complaint on jur-

isdictional grounds) (citing *Backo v. Local 281*, 438 F.2d at 182).

### C. The December 6, 1993 TRO

The TRO in this case presents a hybrid of those cases in which the order terminates but the compensatory civil contempt does not abate, and the exception enunciated in *United Mine Workers*. The TRO was eventually vacated because it was intended to last until the determination of the preliminary injunction motion, and that motion was denied.[5] The Court's refusal to issue the preliminary injunction, however, did not represent a determination by this Court that the TRO was erroneous or exceeded the jurisdiction of this Court. The Respondents nevertheless contend that under the *United Mine Workers* exception, if the Court vacates the TRO *for any reason*, a compensatory civil contempt claim for disobedience of the TRO must also fall.

■ The Respondents' argument overlooks the rationale for the *United Mine Workers* exception. If a Court erred in issuing an order, the beneficiary gained no rights. Without a right there can be no remedy, and the request for compensatory civil contempt based on disobedience of the erroneous order must be denied. Where, however, the order is valid, it creates rights, and the subsequent vacatur of that order does not affect the damage remedy based on the breach of those rights. The focus is not, therefore, whether the order has vacated, but instead, whether it properly issued. If it did, the *United Mine Workers* exception does not apply, notwithstanding that the order was later vacated.

### 1. Court's Jurisdiction to Issue a Temporary Restraining Order

Keene's adversary proceeding seeking, *inter alia*, an order staying final judgment creditors from satisfying their judgments from the escrow accounts falls squarely within this Court's subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157 and 1334, and the "Standing Order of Referral of Cases to Bankruptcy Judges" (S.D.N.Y. July 10, 1984,

---

**5.** Even if the Court had granted the preliminary injunction, it would have still vacated the TRO

because the preliminary injunction would have superseded it.

Ward, Acting C.J.). In addition, while the Court has exclusive jurisdiction over Keene's property, wherever located, 28 U.S.C. § 1334(d), its jurisdiction extends beyond the limits of Keene's property. Under 11 U.S.C. § 105(a), the Court can "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Neuman,* 71 B.R. 567, 571 (S.D.N.Y.1987) (quoting *In re Baldwin–United Corp. Litigation,* 765 F.2d 343, 348 (2d Cir.1985)), and can enjoin an activity that threatens the reorganization process or impairs the court's jurisdiction with respect to a case before it. *Alert Holdings, Inc. v. Interstate Protective Services, Inc. (In re Alert Holdings, Inc.),* 148 B.R. 194, 200 (Bankr.S.D.N.Y.1992) (citing *LTV Steel Company, Inc. v. Bd. of Educ. (In re Chateaugay Corp.)* 93 B.R. 26, 29 (S.D.N.Y. 1988)).

The Court, therefore, had the power to issue the TRO. The sole remaining question is whether the Court erred in exercising that power.

## 2. The TRO's Merits

 At the outset it is well to bear in mind that the TRO was not necessarily erroneous merely because the preliminary injunction was denied. A trial court has the authority and should enter a stay to preserve the status quo where a showing of reasonable cause and need have been made, pending a fuller hearing on a preliminary injunction. *Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735, 744 (7th Cir.1976); *United States v. International Brotherhood of Teamsters,* 728 F.Supp. 1032, 1057 (S.D.N.Y.), *aff'd,* 907 F.2d 277 (2d Cir.1990); *see United States v. United Mine Workers,* 330 U.S. at 293, 67 S.Ct. at 695–96 ("[T]he District Court had the power to preserve existing conditions while it was determining its own authority to grant injunctive relief.").

 The same criteria govern the issuance of preliminary injunctions and temporary restraining orders. *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,* 735 F.Supp. 141, 143 (S.D.N.Y.), *aff'd,* 916 F.2d 76 (2d Cir.1990), *cert. denied,* 499 U.S.

976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). A debtor seeking injunctive relief need not demonstrate irreparable injury. *In re Neuman,* 71 B.R. at 571; *Keene v. Acstar,* 162 B.R. at 944; *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),* 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988). Instead the Court can enjoin activities that threaten the reorganization process or impair its jurisdiction.

Although the standards governing temporary and preliminary injunctions are the same, the procedures for obtaining them differ. The grant of a temporary restraining order is frequently *ex parte,* generally made on papers alone and in an expedited manner under severe time constraints. The issuance of a preliminary injunction requires notice, an evidentiary hearing and more extensive review of the underlying merits of the case. A temporary stay may validly issue although, under heightened scrutiny, a preliminary injunction should not, and the validity of the TRO in this case must be judged separately from the propriety of Keene's right to preliminary injunctive relief.

In support of its motion for the TRO, Keene claimed, among other things, that an immediate stay was needed in order to prevent irreparable injury that was sure to result from a first-come-first-serve "mad scramble" for Keene's collateral. (Tr.[6] at 68–69). As of the filing date, Keene had pledged $52 million (Tr. at 24)—or nearly 50% of its assets—to secure the escrows and standby letters of credit. Final judgments totalled approximately $20 million (Tr. at 38), and absent a stay, the creditors holding these final judgments could enforce them against the bonds and escrows. On the day the TRO issued, Keene confirmed that some of the sureties had called the letters of credit—even where the underlying bonds had not been called—to satisfy the claims of these judgment creditors. (Tr. at 28). Furthermore, other judgment creditors had commenced turnover proceedings (Tr. at 31–32).

The Court concluded that it should issue a temporary stay because the race to collect the bonds and escrows—events that no one disputed—threatened the reorganization, and

---

**6.** "Tr." refers to the transcript of the December 6, 1993 hearing.

Keene raised serious legal issues requiring further consideration:

> THE COURT: Mr. Weisfelner, I am going to grant your TRO at least for a short period of time.

> The Debtor has argued, and I tend to agree, that a race to collect on the bonds and the escrow judgments will seriously and irreparably impact on its ability to reorganize.

> That does not suggest, however, that certain creditors may nonetheless have that right. There are serious legal issues which have been raised in the course of today's proceedings, and which I think require further airing before a decision is made on whether or not to issue a preliminary injunction.

> There is obviously an issue in terms of the Debtor's interest, if any, in the surety bonds, and particularly those surety bonds where you have final, final judgments.

> It is a separate but related question of the Debtor's interest, if any, in the escrowed accounts, since formerly the Debtor would retain at least a legal interest in an escrowed account.

> And I have been advised by Mr. Levy that the Debtors waived or have taken the position at a prior time that it had no further interest in money that was placed in escrow upon the judgments; that may or may not be correct.

> In any event, the Debtor is now a fiduciary of all of its creditors and I think that issue requires further consideration.

(Tr. at 76–77).

The legal issue concerning the parties' respective interests in the bonds and escrows implicated the automatic stay and Keene's avoiding powers, and required greater consideration. First, it was not apparent to what extent the automatic stay barred the final judgment creditors' collection activities, *i.e.*, whether the surety bonds or escrows were property of Keene's estate. Although the Court ultimately concluded that they were not, at least to the extent they secured final judgments, it reached this conclusion only after a three day evidentiary hearing. Moreover, in reaching this conclusion, the Court rejected the arguments that the issue had already been decided by the Second Circuit in the Limited Fund Action, *Keene v. Acstar*, 162 B.R. at 941 n. 4, or in the case of the escrows, that it was foreclosed by the terms of the escrow orders. *Id.* at 942.

Second, even if these bonds and escrows were not property of the estate, it was nonetheless possible that the arrangements establishing them could be set aside, and Keene's former property recovered, under its strong arm powers. In that event, the recovered property would become property of the estate. 11 U.S.C. § 541(a)(3). It was only after the evidentiary hearing, at which Keene failed to prove that it could avoid the transfer of its property to secure the standby letters of credit or escrows, that the Court concluded these assets could not be recovered. *See* 162 B.R. at 946 n. 5.

Finally, the Court faced a threshold question as to how to decide these issues; should it consider the matter as a global issue, or initially enter a *Celotex*-type injunction? In *Celotex*, another asbestos bankruptcy, the Bankruptcy Court faced a similar situation to the one faced by this Court. At the time of Celotex's filing, it was a defendant in over 140,000 asbestos related personal injury actions, and had posted supersedeas bonds totalling nearly $70 million. *Keene v. Acstar*, 162 B.R. at 945.

At the beginning of the case, the *Celotex* court issued an injunction that, *inter alia*, prevented the judgment creditors from collecting the proceeds of the bonds, and required each final judgment creditor to seek relief from the injunction. *Id.* at 945–46. As each creditor did, the Court would consider the voidability of the judgment or the surety agreement, whether the surety agreement could be rejected, the effect of relief from the injunction on the reorganization process, the treatment of punitive damage awards, joint and several liability and contribution claims. *Id.* at 946 (quoting *In re Celotex Corp.*, 128 B.R. 478, 484 (Bankr.M.D.Fla.1991)).

This Court ultimately decided not to follow this approach, but reached this conclusion only after the evidentiary hearing. *Keene v. Acstar*, 162 B.R. at 946. The Court nevertheless could have exercised its discretion to

follow the *Celotex* approach, issue the requested injunction, and require each final judgment creditor to seek relief from its terms before proceeding.

## CONCLUSION

This Court issued the TRO upon a sufficient showing of an imminent threat to the reorganization and serious questions regarding the parties' property rights in the bonds and escrows. The issuance of the TRO fell within this Court's jurisdiction, and was intended to preserve the status quo while it determined whether to grant injunctive relief. *See United States v. United Mine Workers*, 330 U.S. at 293, 67 S.Ct. at 695–96.

Hence, the TRO was neither erroneously issued nor jurisdictionally defective. While this Court ultimately denied the preliminary injunction, the TRO was not an "order [that] never should have passed" for purposes of the *United Mine Workers* rule. Rather, this case falls within the rule that the termination of a properly issued order does not affect a party's right to compensatory civil contempt damages arising from its violation.

For the foregoing reasons, the application to dismiss the Contempt Motion for legal insufficiency is denied. The parties are directed to appear at a conference on June 10, 1994, at 10:00 a.m., to schedule the continuation of the contempt hearing.