In re KEENE CORPORATION, Debtor.

Bankruptcy No. 93 B 46090 (SMB).

United States Bankruptcy Court,
S.D. New York.

March 7, 1997.

As Corrected March 12, 1997.

Berlack Israels & Liberman (Edward S. Weisfelner, of counsel), New York City, for Debtor.

Marcus Montgomery, P.C. (John J. Preefer, of counsel), New York City, for the Official Committee of Unsecured Creditors.

Fried, Frank, Harris, Shriver & Jacobson (Matthew Gluck, of counsel), New York City, for Matthew Gluck.

Hughes Hubbard & Reed L.L.P. (Theodore V.H. Mayer, Mary Elizabeth Tom), Acting United States Trustee, (Brian S. Masumoto, of counsel), New York City, for Trustees of Keene Creditors Trust.

**MEMORANDUM DECISION REGARDING FEE APPLICATIONS BY COUNSEL TO THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

STUART M. BERNSTEIN, Bankruptcy Judge.

This decision concerns the two remaining fee applications in this confirmed, chapter 11 case. Berlack, Israels & Liberman ("Berlack"), counsel to the debtor, seeks total fees of $5,593,053.05 and expenses of $672,139.68. Marcus Montgomery, P.C. ("Marcus"), counsel to the official committee of unsecured creditors (the "Committee"), seeks $3,967,214.01 [1] in fees and $358,271.44 in expenses. The aggregate compensation that the two firms seek—$10,590,678.00—represents approximately 76% of the total compensation sought by the twenty-two applicants in this case. Further, it represents approximately one-third of the cash and cash equivalents in the estate. For the reasons set forth below, the Court concludes that certain of these services were unreasonable, unnecessary or both, and reduces the allowances accordingly.

## FACTS

Keene Corporation filed its chapter 11 case on December 3, 1993. The background leading up to the filing is set forth in the Court's opinion, *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 162 B.R. 935 (Bankr.S.D.N.Y.1994), familiarity with which is assumed. After Keene commenced its case, Arthur J. Gonzalez, then United States Trustee, appointed the Committee. It consisted of persons holding asbestos-related personal injury, wrongful death or property damage claims.[2] Although he appointed the actual claimants to the Committee, the Committee's business was conducted through their attorneys. In particular, Stanley J. Levy, Esq., a member of the firm of Levy, Phillips & Konigsberg, became its chairman.

During the first year that the case was pending, the debtor and the Berlack firm expended considerable amounts of time, energy and money attacking the Committee, its members and their attorneys. They directed most of these efforts at Mr. Levy, the nemesis of Glenn Bailey, Keene's then president and chairman. For example, the debtor incurred over $180,000 in legal fees and expenses litigating a civil contempt motion against Stanley Levy, but sought to recover minimal damages. *See Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 168 B.R. 285 (Bankr.S.D.N.Y.1994), *appeal dismissed sub nom. Keene Corp. v. Williams Bailey & Wesner, L.L.P. (In re Keene Corp.)*, 182 B.R. 379, 385–86 (S.D.N.Y.1995). In addition, the debtor sought to compel Mr. Levy's firm to file a statement pursuant to Rule 2019 [3] of

---

1. This amount reflects a reduction of $45,058.49 in previously disallowed fees. Marcus does not ask me to reconsider these previous disallowances in its final fee application.

2. The debtor was no longer operating, and hence, it did not have the trade debt that one normally finds in a chapter 11 case and represented on the Committee.

3. Federal Bankruptcy Rule 2019 provides as follows:

(a) *Data Required.* In a ... chapter 11 reorganization case, ... every entity ... representing more than one creditor or equity security holder ... shall file a verified statement setting forth

(1) the name and address of the creditor or equity security holder;

(2) the nature and amount of the claim or interest and the time of acquisition thereof unless it is alleged to have been acquired more than one year prior to the filing of the petition;

(3) a recital of the pertinent facts and circumstances in connection with the employment of the entity ...; and

(4) with reference to the time of the employment of the entity, ... the amounts of claims or interests owned by the entity ... the times when acquired, the amounts paid therefor, and any sales or other disposition thereof.

The statement shall include a copy of the instrument, if any, whereby the entity ... is empowered to act on behalf of creditors or equity security holders. A supplemental statement shall be filed promptly, setting forth any material changes in the facts contained in the statement filed pursuant to this subdivision.

(b) *Failure to Comply; Effect.* On motion of any party in interest or on its own initiative, the court may

(1) determine whether there has been a failure to comply with the provisions of subdivision (a) of this rule or with any other applicable law regulating the activities and personnel of any entity ... in connection with any solicitation and, if it so determines, the court may

the Federal Rules of Bankruptcy Procedure, and/or punish the firm for its failure to do so. It does not appear that the debtor sought similar relief against the many other tort lawyers who represented numerous claimants but who also failed to follow the procedures set forth by Federal Bankruptcy Rule 2019. In addition, the debtor made a motion to disband the Committee, claiming that the transaction of business through the tort lawyers instead of the claimants themselves constituted, *inter alia,* a breach of fiduciary duty. Finally, as discussed in greater detail below, the debtor sued twenty-seven law firms, including Levy's, for approximately $400 million. The lawsuit, known as "Keene 27," or the "Unjust Enrichment Action," claimed that these lawyers drove Keene into bankruptcy by filing non-meritorious claims, or relying upon false evidence, to collect damages. In addition, Keene sought to recover the excess contingent legal fees paid by the defendants' clients.

The civil warfare between the debtor and the Committee reached its peak in November 1994, and culminated with the fight over exclusivity. The parties had previously agreed to several litigation moratoria in an effort to work things out peacefully, but could not agree to a consensual resolution of the case. In or around the beginning of November 1994, an epidemic of new litigation broke out. The debtor moved to disband the Committee, the United States Trustee moved for the appointment of an examiner to consider the allegations made by the debtor in its disbandment motion and the Committee's responses, and the Committee moved for the appointment of an operating trustee, charging that the debtor's management had mismanaged and wasted its assets. One of the wasteful actions the Committee identified was the Keene 27 litigation. Its motion stat-

ed that Berlack had already billed in excess of $300,000 only five months into that lawsuit.

Concerned about the mounting administrative expenses in a case of relatively few dollars (considering the extent of the asbestos-related claims), the Legal Representative for the Future Claimants, Matthew Gluck, Esq., requested a conference which I held in chambers on November 14, 1994, and continued three days later in the courtroom. *Memorandum Decision and Order Granting Debtor's Motion to Extend Exclusivity, Denying the Committee's Motion to Terminate Exclusivity, and Appointing an Examiner* ("*Exclusivity Decision*") dated December 1, 1994, at 7. Mr. Gluck, appointed as Legal Representative several months earlier, had attempted, acting as a *de facto* mediator, to draw the parties into agreement over a consensual plan. (*Id.* at 4.) By early November, he sensed that any chance of an agreement had run out. (*Id.* at 7.)

During the conference, which was attended by representatives of the Berlack and Marcus firms, Mr. Gluck expressed his concern about the mounting costs and endless litigation which did nothing for the creditors in general or his constituency in particular. He opined that the parties had reached an impasse, and that I should terminate exclusivity so that any party in interest could propose a plan. As the debtor was undoubtedly insolvent,[4] and could not confirm a plan over the Committee's objection, the termination of exclusivity would have drastic consequences. The Committee (or the Legal Representative) could then propose a "pot plan" in which all of the debtor's assets would ultimately be paid to the creditors, leaving nothing for the debtor's shareholders.

After hearing the parties, I indicated my inclination to terminate exclusivity, allow

refuse to permit that entity ... to be heard further or to intervene in the case;
   (2) examine any ... authorization, and any claim or interest acquired by any entity ... in contemplation or in the course of a case under the Code and grant appropriate relief; and
   (3) hold invalid any authority, acceptance, rejection, or objection given, procured, or received by an entity ... who has not complied with this rule or with § 1125(b) of the Code.

4. During a prior limited fund class action brought under Fed.R.Civ.P. 23(b)(1)(B), Keene had demonstrated to the satisfaction of the district court that if the tort litigation against it continued unabated, it would run out of money. *Keene Corp. v. Fiorelli,* 14 F.3d 726, 729–30 (2d Cir.1993). The Second Circuit vacated the district court's ensuing preliminary injunction, and dismissed the limited fund action for lack of jurisdiction. *Id.* at 733. Two days later, Keene commenced this chapter 11 case.

each party to file its plan, and let the creditors vote for the one they preferred. *Exclusivity Decision* at 7. The debtor contended that it was entitled to a hearing. I agreed, but limited the hearing to whether the parties had reached an impasse in their plan negotiations.

I conducted the hearing on November 21, 1994. The evidence was surprising. In the Exclusivity Decision, I observed:

> The relationship between the principals of the Debtor and their bankruptcy lawyers on the one hand, and the "plaintiffs' bar" and the Committee's lawyers on the other, has been acrimonious. This acrimony, for which both sides bear blame, has wasted time and squandered estate assets through contentious litigation that ultimately redounds to the detriment of the creditors of this estate. For the period that covers the first approximate nine months of the case, the Court has awarded approximately $5 million in interim fees and reimbursement of expenses. The fees and expenses awarded are primarily attributable to litigation—in large part between the Debtor and the Committee.

*Id.* at 3. Yet, despite what seemed to be their best efforts not to succeed, the Committee, the debtor, and the Legal Representative had actually reached agreement in principle on the framework of a plan. (*Id.* at 10–11.) Concluding that successful negotiations required "communication, supervision, and compulsion," (*id.* at 10), I directed the United States Trustee to appoint a "plan examiner" to supervise negotiations, mediate disputes, and report back to the Court on the progress as well as each party's good faith. (*Id.* at 14–15.)

The United States Trustee appointed the Hon. William H. Webster, a former federal judge and former director of both the Federal Bureau of Investigation and Central Intelligence. After approximately two months of court-ordered meetings, and through the efforts of Judge Webster and his attorneys, the parties reached an agreement in principle on a consensual plan. Much remained to be done, but the parties did it. On June 12, 1996, the debtor and the Committee confirmed their consensual plan under 11 U.S.C. § 1129 and the recently enacted 11 U.S.C. § 524(g).

## SUMMARY OF OBJECTIONS

The Trustees of the Keene Creditors Trust ("Keene Trustees") and the United States Trustee objected to most of the fee applications. The Keene Trustees initially voiced a general concern about the aggregate amount of fees sought. Noting that the cash, cash equivalents and stock distributed under the plan (net of professional fees) fell "well below" $30 million, the total fee requests exceeded $13 million. The entire burden of paying these fees would be borne by "the injured claimants and their widows and orphans who are the Trust's beneficiaries." *Amended Objections of the Trustees of Keene Creditors Trust to Final Fee Applications,* dated Oct. 15, 1996, at 1–2.

The Keene Trustees also lodged specific objections against Berlack's application. They maintained that "certain of the activities for which compensation is sought not only appear to have produced no benefit to the Estate but appeared never to have had any reasonable prospect of producing such benefit." *Id.* at 2. They singled out the Keene 27 action, efforts to establish a bar date, efforts to disband the Committee, and the contempt motion brought against Stanley Levy, Esq. *Id.* Finally, the Keene Trustees objected to the amount billed to the preparation of the interim and final fee applications. *Id.* at 2–3. They did not object to Committee counsel's fee application.

Mary E. Tom, Acting United States Trustee, also challenged the fee applications. She joined in the Keene Trustee's objections, and repeated the Court's earlier concern that the high professional fees resulted from unnecessary, excessive litigation:

> Each side appears to have pursued nearly every conceivable aspect of every issue, and each action has been met by a vigorous response. The result has been the pursuit of activities that, as noted by the Trustees, have produced no benefit to the estate or that have produced benefits that are disproportionate when compared to the cost to the estate.

*Objection of the United States Trustee Regarding Applications for Final Compensation,* dated Oct. 11, 1996, at ¶ 6. The United States Trustee also identified additional, specific areas of services which warranted scrutiny: the Committee's appeal of the appointment of the first examiner, Thomas Moers Mayer, Esq., the Committee's motion for the appointment of a chapter 11 trustee, its research and investigation into fraudulent conveyance litigation, both applicant's services regarding exclusivity issues, the debtor's voting procedures motion, and plan and disclosure statement negotiation and formulation. (*Id.* at ¶ 7.)

At the October 16, 1996 final fee hearing, I voiced my own concerns. I questioned the compensability of some or all of the services relating to Keene 27, the contempt proceedings against Stanley Levy and the Committee's opposition to the debtor's motion to appoint an examiner, and its appeal from the Court's decision granting that motion. I had expressed these same concerns during the interim fee application hearings. All applicants whose fees were the subject of objection were granted additional time to submit further replies. Both Berlack and Marcus submitted additional materials for the Court to consider.

█ I have now had the opportunity to review the Berlack and Marcus fee applications, the objections and the responses. As both the United States Trustee and the Keene Trustees opine, the aggregate fees are certainly high compared to the amount of liquid assets in the case. Nevertheless, if they meet the criteria established under 11 U.S.C. § 330(a), it is neither fair nor appropriate to reduce them solely because they seem excessive. Accordingly, I overrule the pending objections except as noted below.

## DISCUSSION

Initially, I note that the Keene Trustees have resolved their objections to the various fee applications. At the October 16, 1996 hearing on the final fee applications, Edward S. Weisfelner, Esq., a partner in the Berlack

firm, set the agreement out on the record. Berlack agreed to reduce its fee request by $150,000.00 and its expense reimbursement request by $50,000.00. (Transcript of Final Fee Hearing, held Oct. 16, 1996, at 7–8) ("Fee Tr.") The Committee agreed to reduce its total request by $100,000.00. (*Id.* at 8). The United States Trustee had incorporated the Keene Trustees' objections with its own, and it is not clear whether she joined in the resolution of the common objections. (*See id.* at 13–14.)

█ Whether she did is immaterial because the parties cannot "settle" fee applications.[5] *See In re Poseidon Pools of America, Inc.,* 180 B.R. 718, 728 (Bankr.E.D.N.Y.1995). Even in the absence of an objection, the bankruptcy court has an independent duty to review fee applications to protect the estate "lest overreaching ... professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 844 (3d Cir.1994); *accord In re Spanjer Bros., Inc.,* 191 B.R. 738, 747 (Bankr.N.D.Ill.1996); *In re Poseidon Pools of America, Inc.,* 180 B.R. at 728; *In re Ferkauf, Inc.,* 42 B.R. 852, 853 (Bankr.S.D.N.Y.1984) (Bankruptcy Court is "duty bound thoroughly to review fee applications, *sua sponte* ..."), *aff'd,* 56 B.R. 774 (S.D.N.Y.1985). The applicant bears the burden of proof on its claim for compensation. *In re Beverly Mfg. Corp.,* 841 F.2d 365, 371 (11th Cir.1988); *In re Spanjer Bros., Inc.,* 191 B.R. at 747; *In re Bolton,* 43 B.R. 598, 600 (Bankr.E.D.N.Y.1984).

The standards for awarding fees in bankruptcy cases is set forth in 11 U.S.C. § 330(a). The pre-Bankruptcy Reform Act version of this statute, which continues to apply to this case, states:

> After notice to any parties in interest and to the United States trustee and a hearing ... the court may award to a ... professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

---

5. Accordingly, I have ignored, for all purposes, the proposed voluntary reductions offered in con-

nection with the settlement.

(1) reasonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

■ The statute contains two separate criteria, and before determining the reasonableness of the service, the Court must make a threshold inquiry into its necessity.[6] *In re Lederman Enters., Inc.*, 997 F.2d 1321, 1323 (10th Cir.1993); *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 886 (Bankr.W.D.Ky. 1996). The majority of courts hold that a service is "necessary" if it benefits the estate. *In re Engel*, 190 B.R. 206, 209 (Bankr.D.N.J. 1995) (citing cases); 3 Lawrence P. King, *et al., Collier on Bankruptcy* ¶ 330.03[3], at 330–25 (15th ed. rev. 1996) (*"Collier"*). The bankruptcy court may reduce or disallow a request if the underlying services conferred no real benefit on the estate. *See, e.g., Vining v. Ward (In re Ward)*, 894 F.2d 771, 777 (5th Cir.1990) (court may reevaluate prior award to attorneys where judgment they obtained for estate turned out to be uncollectible). A court should not apply this test through hindsight, 3 *Collier* ¶ 330.04[1][b][iii], at 330–32, as a decision reasonable at first may turn out wrong in the end. Rather, the test is an objective one, and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir.1996) (citing *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir.1995) (Posner, C.J.)); *accord In re Drex-*

el *Burnham Lambert Group, Inc.*, 133 B.R. 13, 23 (Bankr.S.D.N.Y.1991).

■ In the case of litigation to recover money for the estate, the debtor's attorney must "make a careful judgment whether the number of billable hours that he would be investing was commensurate with the expected gain." *In re Taxman Clothing Co.*, 49 F.3d at 314; *see generally* 3 *Collier* ¶ 330.03[3], at 330–26 (court should not measure the benefit by what the attorney actually achieved, but rather, "whether the services provided the estate with an opportunity commensurate with the cost"). The attorney has a fiduciary duty to maximize the estate, *see In re Taxman Clothing Co.*, 49 F.3d at 315, and his allowed fees must be borne entirely by the creditors where the estate is insolvent. Before embarking upon costly litigation, a reasonable attorney must weigh the likely benefit to the creditors against the likely cost. *In re Allied Computer Repair, Inc.*, 202 B.R. at 887. Once it becomes reasonably obvious that the prospective costs of commencing or continuing litigation will exceed any benefit to the estate, the attorney is duty bound to abandon the claim. *In re Taxman Clothing Co.*, 49 F.3d at 315; *In re Allied Computer Repair, Inc.*, 202 B.R. at 887.[7]

## I. BERLACK FEE APPLICATION

### A. Keene 27 a/k/a/ The Unjust Enrichment Lawsuit

#### 1. Origins of Keene 27

Berlack has failed to prove that the vast majority of services rendered in connection

---

**6.** The professional must have actually rendered the services as well. No party has argued that these professionals "padded" their time—*i.e.,* never rendered the services that they billed.

**7.** In its supporting memorandum, dated Oct. 25, at 2, Berlack argues for the following test:

As a matter of law, we posit the following: where counsel, in compliance with the ethical rules, represents its client zealously and effectively in litigation, and where every matter resolved in that litigation was resolved in favor of that client, it would be tantamount to an abuse of discretion to deny that counsel its reasonable fees.

This is little more than an "actual services" test, which compensates an attorney for billed time, without regard to the reasonableness or necessity of the service. Under section 330(a), however, it is not enough for an attorney to work ethically and zealously for a client whose interests may be antithetical to the estate's. *See In re Allied Computer Repair, Inc.*, 202 B.R. at 886 ("Simply put, billable hours do not necessarily translate into compensable hours."). In this regard, the services must benefit the estate, not the debtor whom Berlack represented. In addition, "success" depends on the subjective view of the one that measures it. A victory in battle may be Phyrrhic when followed soon thereafter by the "victor's" unconditional surrender in the war.

with the Keene 27 matter was necessary. Keene 27 appears to have sprung postpetition from the imagination of Glenn Bailey. Keene did not assign any value to its Keene 27 claim during the limited fund class action proceedings, and did not schedule it as an asset in this bankruptcy. Nevertheless, it was doubtless percolating for a great deal of time. One of Mr. Bailey's criticisms of the tort system concerned the substantial contingency fees that plaintiffs' lawyers earn. These lawyers often work for only a few hours, without risk of losing the case, and earn a substantial contingent fee.

Bailey became one of the most vocal critics of the tort system, and if he is to be believed, some of the asbestos lawyers targeted him and Keene for destruction.[8] In a memorandum, dated May 2, 1994 ("Bailey Mem.") (attached as Exhibit 4 to the Committee's November 4, 1994 motion to appoint a chapter 11 trustee), Mr. Bailey wrote how five plaintiffs' law firms, including Stanley Levy's, had "tried for years to bankrupt Keene" by selecting certain jurisdictions "with judges who would permit them to introduce irrelevant evidence and who would keep out significant Keene defense arguments." (Bailey Mem., § VIII, at 2.) These five lawyers had conspired out of greed "for outrageous contingency fees and expenses" to cause Keene to spend over $16 million to defend itself against non-meritorious claims. (*Id.* § VIII, at 4.) Toward its conclusion, Bailey issued his call for action:

> Keene should consider a suit against these 5 law firms (out of 175 plaintiff firms) for apparently conspiring to bankrupt Keene for their own greedy purposes. Note how they conspired to make sure Keene could not satisfy all of its meritorious claimants 100% and thereby avoid bankruptcy.

(*Id.* at § VIII, at 4.)

The memorandum was written at a time when Berlack was already considering this issue. They opened their file on this matter in early February, 1994, and for the next two months, several lawyers at the firm spent increasing amounts of time reading articles

by Cardozo law professor Lester Brickman on the subject of contingency fees, and doing legal research and writing memoranda of law. Berlack billed only 10.4 hours to the matter in February, but billed 94.5 hours in March, 1994 and 122.2 hours in April. After Bailey's memorandum, the pace picked up, and Berlack billed 370.7 hours in May. All totalled, Berlack billed $149,094.00 in legal time to researching and preparing the Keene 27 complaint that they filed on June 3, 1994. (*Affidavit of Carole L. Fern in Further Support of the Final Application for Award of Compensation and Reimbursement of Expenses Filed by Berlack, Israels & Liberman, LLP, Former Counsel to the Debtor,* sworn to Oct. 24, 1996, at ¶ 49) ("Fern Affidavit.")

### 2. The Complaint

The complaint charged that the twenty-seven defendant law firms drove the debtor into bankruptcy by presenting and forcing it to pay non-meritorious claims. *In re Keene Corp.,* 182 B.R. at 381. During the preceding two decades, Keene had spent over $500 million in legal fees relating to asbestos-related liability matters, (Complaint ¶ 5), paying the defendant firms or their predecessors $165 million on behalf of their clients. As a result of contingency arrangements, the defendants retained an aggregate of $55 million. (*Id.* at ¶ 5.) These defendants obtained the vast majority of these sums by actively soliciting and filing non-meritorious claims, "supported" by false and misleading medical reports and/or product identification claims. (*Id.* at ¶ 6.)

These activities harmed not only Keene but the defendants' clients. The defendants represented numerous clients despite clear conflicts, (*id.* at ¶ 7), and overcharged their clients through exorbitant contingency fees. (*Id.*) The debtor sought to recover the $55 million plus an additional $20 million in legal fees that Keene incurred litigating claims ultimately settled in amounts consistent with Keene's settlement guidelines and previous offers. (*Id.* at ¶ 8.) Keene sought total dam-

---

8. I do not pass judgment on Mr. Bailey's views nor the fairness of the tort system, neither of which are before me.

ages of approximately $400 million, alleging $130 million in actual damages, and trebling the award under the antitrust and RICO laws.

The complaint elicited an immediate reaction from one of the members of the Committee who was *not* a named defendant. Charles Vihon, Esq., the attorney for Committee member Anderson Area Medical Center moved to enjoin the prosecution of Keene 27.[9] He argued that Keene had not obtained prior court approval to commence the lawsuit, could not possibly prevail, and the lawsuit wasted the debtor's limited resources. The motion was denied, primarily because it by-passed the issues presented in and more appropriately decided through a motion to dismiss. In addition, Berlack's counsel pointed out that an objection to a fee application was the appropriate remedy for unreasonable and unnecessary legal services. (Transcript of Hearing, held Nov. 17, 1994, at 54.) I denied the motion, noting in the decision from the bench that "[t]he attorneys' fees can be cut." (*Id.* at 62.)

After commencing Keene 27, Berlack billed a substantial amount of time to the matter. The Fern Affidavit identifies the component costs, and I mention only some of the more expensive submatters. In addition to the $149,094.00 for researching and preparing the complaint, Keene incurred fees of $170,447.00 defending against seven separate motions to dismiss while simultaneously preparing an amended complaint, (Fern Affidavit at ¶ 69), $74,569.00 opposing three separate motions to withdraw the reference, (*id.* at ¶ 62), and $28,860.00 moving unsuccessfully for a temporary restraining order to prevent alleged threats to bring non-bankruptcy actions challenging the Keene 27 case. (*Id.* at ¶ 59.) In the end, Berlack billed, 2,264.60 hours, or approximately one full lawyer-year to this matter. The time value of these services totalled $488,348.00.

The fees relating to Keene 27 were targeted by the Committee in its objections to Berlack's interim fee requests. In the *Limited Objection of the Official Committee of Unsecured Creditors to the Third Application of Berlack Israels & Liberman for an Interim Award of Compensation and Reimbursement of Expenses,* dated July 13, 1994, it pointed out that Berlack had already billed $115,356.50 to the "highly speculative" matter that even Berlack described as "cutting edge." (*Id.* at ¶ 15.) Further, the Committee insisted that the Keene 27 matter was just a "negotiating tool to force the Committee and creditors to accept an otherwise unacceptable plan offer." (*Id.*) The Committee asked me to defer consideration of all fees attributable to Keene 27 until "it is clear there is a real and meritorious basis for the legal action as opposed to a bad faith negotiating tool." (*Id.*); see also *Objection to Application for Compensation and Reimbursement of Expenses as Counsel and Accountants to the Debtor filed by Berlack, Israels & Liberman and KPMG Peat Marwick,* dated Mar. 8, 1995, at 2–3 (characterizing Keene 27 as a negotiating "hammer" filed without appropriate due diligence.)

In response to this and similar objections, Berlack reiterated its view that Keene 27 had merit, and could materially enhance the estate's ability to compensate truly meritorious claimants. See *Response to Committee's Objection to the Third Application of Berlack, Israels & Liberman for Compensation and Reimbursement of Expenses for the Period from April 1, 1994 through May 31, 1994,* dated July 19, 1994, at ¶¶ 31–33; *Response to Committee's Objection to the Sixth Application of Berlack, Israels & Liberman for Compensation and Reimbursement of Expenses for the Period from October 1, 1994 through January 31, 1995,* dated Mar. 15, 1995, at ¶¶ 10–12. I dealt with the objection at that time by imposing substantial holdbacks, thereby reducing the amounts paid on account of allowed, interim fees.[10]

9. The motion, though made soon after the commencement of Keene 27, was not argued until November 17, 1994. The parties had entered into various litigation moratoria in the interim, but these ended, as explained above, by early November.

10. These holdbacks presently exceed $1.4 million.

### 3. Confirmation and the Dismissal of Keene 27

As part of the plan, Keene agreed to dismiss the Keene 27 case with prejudice, but more to the point, without any payment to the estate. According to the debtor, dismissal of Keene 27, as part of the plan, was "in the estate's best interests and will serve to maximize recoveries to all constituents." (*Second Amended Disclosure Statement* § IV.C.4(c)(ii), at 29.) The debtor faced a formidable burden at confirmation. Through confirmation, it was prepared to give up its largest litigation claim, and potentially, its most valuable asset.

The debtor met this burden through an offer of proof which, in substance, conceded that the Keene 27 action lacked legal and factual merit, and provided no leverage in the negotiations with the Committee. At the confirmation hearing held on June 12, 1996, at which District Judge Mukasey and I co-presided, Mr. Weisfelner proffered the testimony of Timothy Coyne, the debtor's president.

The proffer stated, in substance, that in responding to the several motions to dismiss, Keene undertook expanded factual investigation and legal analysis. As a result of this investigation, it concluded that "there were significant problems with the lawsuit." (Transcript of Confirmation Hearing, held June 12, 1996, at 67) ("Confirmation Tr.") "[T]he continuing investigation raised new, but extremely serious, concerns about the validity of underlying theories of suit, as well as whether the facts necessary to establish liability under any of the theories asserted could be proven." (*Id.* at 67–68.) Keene believed that there was a "reasonable possibility, if not probability," that the motions to dismiss would be granted. (*Id.* at 68.) Even if the complaint withstood a motion to dismiss, "there was no doubt that Keene would face potentially insurmountable obstacles in pursuing the case and in establishing liability." (*Id.*) Continuing the suit would raise questions of waste as well as good faith. (*Id.*)

Moreover, the Committee and Legal Representative made it clear that the continuation of the suit would not serve as a lever in plan negotiations. (*Id.*) Their willingness to agree to a distribution to old equity depended on an end to further delay and litigation expense. (*Id.*) The Committee would not agree to economic concessions or plan allocations that were tied to the lawsuit. (*Id.* at 69.) Further, continuation of the lawsuit—and mounting administrative expenses—would lead to an impasse. (*Id.*)

The proffer concluded:

> Mr. Coyne would testify that, in the final analysis, Keene concluded that whatever speculative impact the debtor thought the lawsuit might have had on planned [*sic*] negotiations had not and likely would not be achieved, and that any continuation of the lawsuit was not in the best interests of the estate.

(*Id.*) On the basis of this proffer and the other proof, the Bankruptcy and District Courts signed the order approving confirmation.

### 4. Berlack's Fee Application

Berlack's original papers submitted in support of their final fee application discussed the abundant amount of work that they did on the Keene 27 matter, but ignored the weaknesses of the case. (*See Final Application for Award of Compensation and Reimbursement of Expenses Filed by Berlack, Israels & Liberman, LLP, Former Counsel to the Debtor*, dated Sept. 16, 1996, at ¶¶ 116–27) ("Berlack Fee Application.") The issue, however, became the subject of objections by the Keene Trustees and the United States Trustee, and engendered substantial colloquy at the final fee hearing. On that occasion, Mr. Weisfelner characterized Mr. Coyne's proffered testimony as "carefully scripted," and explained that it was "part of a specific agreement among the Debtor, the Creditors Committee and a handful of voters" to ensure acceptance of the plan. (Fee Tr. at 19.)

The debtor, according to Mr. Weisfelner, reasonably expected to recover damages when it filed Keene 27, but after reviewing the motions to dismiss, became concerned about its standing and the ability to prove its case. (*Id.* at 19–20.) It was only then that the debtor consulted with its prepetition de-

fense counsel regarding their possible testimony. (*Id.* at 20.) As a result of those discussions, the debtor

> began to understand from their perspective the difficulty of proving the impropriety of settlements that were entered into on Keene's behalf nationwide, consistent with former guidelines, and began being told by underlying counsel about their unwillingness, not refusal, based on pressure that had been brought to bear on them in other asbestos cases to testify on Keene's behalf.

(*Id.*) The debtor's factual due diligence—its discussions with its prepetition defense counsel—involved only $20,000.00 to $25,000.00 of legal time. (*Id.* at 23–24.) [11]

Despite these revelations, Berlack never wavered in its belief that the lawsuit could succeed. Departing from the "carefully scripted" proffer of Mr. Coyne's testimony, Mr. Weisfelner stated that the debtor gave up this claim as part of an overall settlement, "notwithstanding my client's considered opinion that was true up through and including confirmation of the plan, that Keene 27 had a reasonable chance of success on the merits." (*Id.* at 26.)

In its post-hearing submissions, Berlack continued to hammer that *at the time* it commenced Keene 27, they believed that the suit had a reasonable basis to succeed. Mr. Coyne now submitted a supporting affirmation that also deviated from his "carefully scripted," prior testimony. Coyne believed on June 3, 1994 *and still believes* "that the lawsuit had substantial value [12] to the estate." (*Affirmation of Timothy E. Coyne With Respect to the Final Application for Award of Compensation and Reimbursement of Ex-*

*penses Filed by Berlack, Israels & Liberman LLP, Former Counsel to the Debtor,* dated Oct. 24, 1996, at ¶ 4) ("Coyne Aff.") Keene obtained millions of dollars in value for the estate, its creditors and shareholders in the direct form of a negotiated plan and a reduction in plaintiffs' attorneys' contingency rates. (*Id.*)

Nevertheless, Keene perceived problems: its standing to pursue disgorgement of fees, the unlikelihood that Keene's former defense counsel would testify favorably, and doubt that the court would permit Keene to continue to fund the litigation with estate funds regardless of its merits. (*Id.* at ¶ 6.) Further, during plan negotiations, the Committee, dominated by the plaintiffs' lawyers, insisted that Keene 27 had to be dismissed. (*Id.* at ¶ 7.) Despite acceding to this demand, some of the plaintiffs' lawyers still threatened to vote against the plan "to keep Keene from ever being able to say that the estate had benefited from the Unjust Enrichment Action." (*Id.* at ¶ 8.) This lead to the "compromise language" and "negotiated language" of the proffer. (*Id.*) [13]

Coyne now insisted that the Keene 27 action provided substantial negotiating leverage to the debtor:

> From my perspective, and Keene's perspective, bringing the Unjust Enrichment Action *proved to be a most effective negotiation lever.* In my opinion, the Unjust Enrichment Action, in fact, played a significant role in Plan negotiations. For example, the Committee agreed to reduce plaintiffs' contingency fees to 25% (down from the usual 33% to 50%) in return for, among

---

11. In a post-hearing submission, Berlack clarified their "due diligence" costs. They incurred $12,002.50 investigating the facts in preparing the original complaint, and an additional $21,-862.00 in connection with the proposed amended complaint. (Fern Affidavit at ¶ 67 n. 12.)

12. Coyne's selection of the word "value," rather than "merit," may be another example of careful scripting. The value, as the next sentence in the affirmation indicates, related to the concessions that the dismissal of Keene 27 won for the unsecured creditors. This is just another way of saying the suit provided leverage. However, a party cannot commence a patently unmeritorious suit as a lever to force a negotiated settlement.

In fact, this was the gravamen of the debtor's claim against the defendants in the Keene 27 action.

13. Based on the advice of counsel that the original complaint might not survive motions attacking its "specificity," Coyne directed counsel to conduct a further investigation and prepare an amended complaint. Coyne felt that the draft amended complaint had a much better chance of surviving a motion to dismiss, but was "still deeply concerned" that the debtor would not be permitted to use estate funds to defend the amended complaint against another likely round of dismissal motions. (Coyne Aff. at ¶ 10.)

other things, the dismissal of the Unjust Enrichment Action.

(*Id.* at ¶ 12) (emphasis added.)

This latter statement was a 180 degree turn from his proffered testimony that "whatever speculative impact the debtor thought the lawsuit might have had on planned [*sic*] negotiations had not and likely would not be achieved." (Confirmation Tr. at 69.) He cannot explain this contradiction by suggesting that his proffered testimony was "carefully scripted," or "compromise language" or "negotiated language." Testimony must be truthful, not scripted. While Mr. Coyne's most recent "spin" may represent a more accurate analysis—a point the Court does not decide—he gave contrary testimony through his proffer at the confirmation hearing when the debtor was trying to minimize the merit (and value) of Keene 27.

Taking the confirmation testimony on its face, Berlack concluded at some point that the factual and legal problems with the Keene 27 action were so serious that it was an appropriate exercise of its fiduciary duty to abandon it. Berlack is entitled to the fees generated in this matter to that point, provided the fees are also reasonable. Not surprisingly, Berlack places this epiphany relatively late in the game. They did not discover these serious legal and factual infirmities until after they reviewed the motions to dismiss and interviewed the debtor's prepetition defense counsel. The problem Berlack faces is that they have failed to demonstrate why they did not discover these flaws sooner.

For example, Berlack never identifies the significant legal infirmities that the dismissal motions apparently revealed, or explains how they could have missed them while spending over $149,000.00 researching and preparing the original complaint. Prior to filing the Keene 27 action, Berlack apparently researched the legal issues to death. No less than five different lawyers read Professor Lester Brickman's articles on contingency fees, and billed the estate for the education. Yet the defendants brought some undisclosed insight to the case that all this legal research missed.

Mr. Coyne's affirmation refers to new concerns involving the debtor's standing to recover excessive contingency fees charged by the defendants against their own clients. But Keene's standing always appeared highly questionable. The debtor could not rely on antitrust principles because it was, at most, an "indirect purchaser" of the defendants' legal services. *See Kansas v. Utilicorp. United, Inc.,* 497 U.S. 199, 208, 110 S.Ct. 2807, 2812–13, 111 L.Ed.2d 169 (1990) (local utility customers lacked standing to sue natural gas pipeline supplier for conspiring to fix prices charged to utility even though utility passed on total overcharge to customers). Further, under well-settled principles of bankruptcy law, a trustee (or debtor in possession) cannot assert the personal, direct claims of creditors. *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 434, 92 S.Ct. 1678, 1688, 32 L.Ed.2d 195 (1972); *Goldin v. Primavera Familienstiftung (In re Granite Corp.),* 194 B.R. 318, 324 (Bankr. S.D.N.Y.1996). Consequently, Berlack's explanation is unconvincing, and lends further credence to the Committee's arguments that Keene 27 was simply a negotiating tool that did not work.

Berlack has also failed to explain why they did not interview the debtors' former defense lawyers until after receiving the motions to dismiss. In Keene 27, the debtor was collaterally attacking settlements that these same lawyers had presumably supported and submitted to various courts. Berlack's subsequent investigation revealed—not surprisingly—that the debtor's former defense counsel would not testify favorably on this point. Did Berlack file the suit expecting the debtor's own lawyers to say that the settlements were fraudulent and insupportable? The debtor and Mr. Coyne suggest that the plaintiffs' bar pressured the lawyers into refusing to testify, but this claim is spurious. Neither the debtor nor Berlack name names or cite examples of what amounts to criminal obstruction of justice. Indeed, it is difficult to imagine what pressure the plaintiffs' lawyers could bring to bear on their former adversaries. In any event, if the problem was their reluctance to tell the truth, Keene could have (and should have) compelled the testimony of

its former lawyers if necessary to recover nearly $400 million.

■ In short, Berlack has failed to demonstrate that it exercised legal or factual due diligence. There is no evidence that Berlack ever weighed the relative costs and benefits of the litigation to the creditors and the estate. Instead, it launched a "cutting edge" lawsuit of highly speculative merit, doubtless at the insistence of Bailey. Not surprisingly, the lawsuit invoked an expensive counterattack from a well financed group of defendant lawyers who capably pointed out the shortcomings that had been overlooked or ignored.

Accordingly, the fee request pertaining to this matter must be substantially reduced. Although I could justify denying Berlack any fees for this matter based upon the "inconsistent" testimony between the confirmation hearing and fee applications, this seems harsh. Counsel should not be discouraged from investigating potential assets, including causes of action. According to Ms. Fern, the debtor expended approximately $35,000.00 on "due diligence," and this should be compensable.

Similarly, Berlack is entitled to reasonable compensation for the time spent initially researching the legal issues. I assume that this research revealed—or should have revealed—the same shortcomings, highlighted in the motions to dismiss, which provoked the debtor to dismiss the lawsuit for lack of merit. The time records indicate that Berlack billed approximately $80,000.00 to the legal research and preparation of memoranda before filing the original complaint. Nevertheless, at least five lawyers were involved, and in some cases, all billed for reading the same secondary materials. Because these records reflect duplication, I have reduced this aspect of the award to $65,000.00. I

conclude, therefore, that $100,000.00 is reasonable compensation for the services necessarily rendered in this matter, and disallow the sum of $388,348.00.

## B. The Contempt Motion

■ The services that Berlack rendered in connection with the contempt motion against Stanley Levy, were also unnecessary, but on different grounds. This claim had legal and factual merit. However, the maximum possible recovery was so small that no reasonable attorney would have commenced this proceeding.

The background facts are set out in *In re Keene Corp.*, 168 B.R. at 286–88. In brief, this Court entered a temporary restraining order ("TRO") on December 6, 1993. The TRO restrained the enforcement of various supersedeas bonds and escrow arrangements that were designed to secure adverse money judgments rendered against the debtor. The debtor alleged that one day later, Mr. Levy and/or his partners commenced or continued efforts in the state and federal courts to enforce these escrows. Counsel for the debtor had to appear before two different courts on December 9, 1993, to advise them of the bankruptcy case and oppose the relief. District Judge Jack Weinstein dismissed the federal case that same day, and the state court deferred to the proceedings in this Court. The matter began and ended within forty-eight hours, and Mr. Levy failed to collect any of the escrowed money.

The debtor reasonably and necessarily incurred some minimal legal fees because its attorneys had to attend to these matters. Nevertheless, on December 28, 1993, the debtor formally moved [14] to hold Mr. Levy, two of his partners, and his law firm, in *civil* contempt.[15] The motion alleged that the

14. Mr. Weisfelner implied at the fee hearing that the Court encouraged the debtor to bring the motion. (*See* Fee Tr. at 31.) This is not, however, how the events played out. On December 13, 1993, the Court was about to start the preliminary injunction hearing initiated by the debtor. Before we began, Mr. Weisfelner advised the Court of the circumstances underlying the contempt. He opined that the Court had "sufficient basis on the record to take appropriate action now," but if the Court preferred, the debtor was

prepared to present appropriate pleadings. (Transcript of Hearing, held Dec. 13, 1993, at 23.) After Mr. Levy responded, the Court observed that the actions seemed to violate the spirit, if not the letter, of the TRO, but "if the debtor intends to pursue that, they will be pursued in a separate proceeding." (*Id.* at 28.)

15. The debtor also sought orders of contempt against another lawyer, Steven J. Cooperstein, Esq., and his firm, Brookman, Rosenberg,

debtor had suffered damages in excess of $20,000.00. However, Mr. Weisfelner subsequently conceded that the debtor had proven minimal damages during the contempt hearing, equating the amount to "carfare." (Fee Tr. at 30.)

Like the Keene 27 matter, the contempt motion was withdrawn as part of the plan. Hence, it was never concluded. Yet despite the small sum involved, both sides litigated aggressively, and the matter generated substantial fees. The Court conducted several hearings, including part of a trial, and the parties fought long and hard over whether the vacatur of the temporary restraining order meant the debtor's damage claim must fall. *See In re Keene Corp.,* 168 B.R. 285. In the end, the debtor billed $184,014.50 to this matter.[16]

While Keene likes to argue that it filed the contempt motion to vindicate the integrity of the Court's order, it never sought criminal contempt, the appropriate procedure for that purpose. *See Latrobe Steel Co. v. United Steelworkers of America, AFL–CIO,* 545 F.2d 1336, 1343 (3d Cir.1976); *accord In re Keene Corp.,* 168 B.R. at 288. Instead, Berlack commenced a *civil* contempt proceeding, undoubtedly at Mr. Bailey's insistence, ostensibly to recover its "carfare," but in fact, to punish Mr. Levy. No reasonable attorney, however, could have believed that it would be worth the cost and effort to pursue this

matter in light of the anticipated benefit to the estate.[17] This proceeding is reminiscent of *In re Taxman Clothing, Co.,* 49 F.3d 310, in which special counsel commenced a $61,-000.00 preference claim (later reduced to $33,000.00), and sought $85,000.00 in compensation. *Id.* at 311–12. Criticizing the applicant, Judge Posner observed that a trustee's attorney must sometimes forbear from attempting to collect an asset because the costs of collection exceed the value of the asset. *Id.* at 315; *accord In re Allied Computer Repair, Inc.,* 202 B.R. at 887 (Attorney for the estate is obligated to "abandon litigation once it becomes reasonably obvious that [its] cost ... is out of sync with the value of the asset sought to be recovered"). The Court ultimately directed him to retain $7,000.00 and disgorge the balance of the $85,000.00 he had already received as interim compensation. *Id.* at 316.

Here, the maximum that the debtor could have recovered was Berlack's "carfare." It is difficult to accept that in a non-bankruptcy context, where one who must answer to shareholders, a corporate manager would authorize a lawyer to pursue such a case. In bankruptcy, however, the temptation exists because the debtor is paying the legal fee with the creditors' money. Further, the chance of recovering the disproportionate legal fees from the alleged contemnors—a dubious proposition at best—makes no differ-

---

Brown & Sandler. The Court ultimately denied that aspect of the motion. *See In re Keene Corp.,* 168 B.R. at 286 n. 1.

**16.** *See* Fern Affidavit at ¶¶ 10, 16, 21, 23, 26, 29, 33, 37 and 42. Berlack's corresponding time records (matter no. 025) only account for $22,-423.00 in time. The Court assumes that the balance of the time was billed under one or more of the other thirty-five billing categories.

**17.** Berlack unsuccessfully tried to extricate themselves and the debtor from legal quicksand by offering to settle early and often. At a January 7, 1994 hearing, Carole Fern, Esq. of Berlack stated that she would entertain an offer to pay the legal fees incurred running around to the state and federal courts on the one day. (Transcript of Hearing, held Jan. 7, 1994, at 17.) The Fern Affidavit, at ¶¶ 32, 36, refers to other settlement attempts.

The debtor's settlement proposals involved an element of retribution, and were doomed from the start. The debtor insisted that Levy's firm

admit that it violated the TRO. (Fern Affidavit, Ex. 7.) An attorney who violates a court order also violates Disciplinary Rule ("DR") 7–106(A) [22 N.Y.C.R.R. § 1200.37], *see American Bank & Trust Co. v. Moyer (In re Moyer),* 51 B.R. 302, 308 (Bankr.D.Utah 1985), and may be guilty of professional misconduct in · violation of DR 1–102(A)(5) (misconduct includes conduct prejudicial to the administration of justice) [22 N.Y.C.R.R. § 1200.3.] *See Matter of Sassower,* 125 A.D.2d 52, 54, 512 N.Y.S.2d 203, 204 (2d Dep't) (sustaining charge of professional misconduct on the basis that attorney obstructed and prejudiced the administration of justice through his defiance of numerous court orders), *appeal dismissed,* 70 N.Y.2d 691, 518 N.Y.S.2d 964, 512 N.E.2d 547 (1987). By requiring Levy's firm to "cop a plea," the debtor imposed an unnecessary condition on a monetary settlement that may well have prolonged the proceedings. It is not surprising that the alleged contemnors rejected Berlack's offer.

ence. The potential upside to the debtor was always minimal. The mere possibility that someone else might pay the legal fees did not justify taking the risk that they would not.

Moreover, Berlack was repeatedly warned during the interim fee hearings that their fees on this matter were unreasonable, and I held back substantial amounts. The Committee objected early and accurately to these fees, stating that they are "not justified by any benefit to the estate or alleged vindication of the integrity of this Court's orders." (*Committee's Objection to Fee Applications of Berlack, Israels & Liberman and Gainsburg & Hirsch,* dated May 2, 1994, at ¶ 3.) Despite these warnings and their own misgivings[18], they proceeded with the matter. While Berlack may have faced a dilemma given Mr. Bailey's strong feelings, the firm still owed an independent fiduciary obligation to consider the costs and benefits of the contempt motion, and refrain from unnecessary litigation. *In re Taxman Clothing, Co.,* 49 F.3d at 314. Although they, rather than Bailey or the debtor, must now bear the brunt of the decision to go forward, this is not grounds to reward the services and punish the creditors who had no say in the matter. Accordingly, I decline to award any compensation for this matter, and disallow the sum of $184,014.50.

## C. The Federal Bankruptcy Rule 2019 Motion

■ At the same time that the debtor was prosecuting its contempt motion, it fired another salvo at Stanley Levy, based upon his firm's failure to comply with Federal Bankruptcy Rule 2019. Berlack had brought the matter to my attention at various times, and at a January 20, 1994 hearing, I directed the firm to file the statement within ten days. Within that period, the firm filed a statement that was wholly inadequate. It consisted of a list of client names and addresses, but omitted any of the other information that Federal Bankruptcy Rule 2019 requires. As a result of the failure to comply, the debtor moved for appropriate relief against Levy, Phillips & Konigsberg on March 15, 1994.

I have no trouble concluding that the motion was necessary, even if it was part of the debtor's multi-pronged attack on Mr. Levy and the other tort lawyers. Berlack had originally raised the matter informally and without expense or fanfare. I directed Levy, Phillips & Konigsberg to file the statement. What they filed in response was insufficient. It was, therefore, appropriate to raise the matter formally through a simple, and inexpensive motion.

Nevertheless, Berlack prosecuted this matter, like the others involving Mr. Levy, with an excess of zeal. The motion should have been fairly simple, consisting of an application with only a half dozen straightforward paragraphs. I had ordered compliance, the Rule states what that entails, the inadequate statement submitted by Mr. Levy's firm spoke for itself and the Rule prescribes what the court can do to the violator. Nevertheless, Berlack assigned five lawyers to the task, and billed 26.70 hours, or approximately $5,700.00 in time, just to file the motion. They billed a total of $13,584.00 to this matter, much of which dealt with the pursuit of discovery against Mr. Levy. However, discovery was unnecessary in light of the self-executing nature of the Rule. Levy, Phillips & Konigsberg either did or did not comply, and in the latter case, an appropriate sanction would have been imposed.

Under the circumstances, I award the sum of $5,000.00 for this matter, and disallow the amount of $8,584.00. The allowed amount represents a reasonable fee for drafting the motion and presenting the matter to the Court which could then exercise its discretion regarding the appropriate relief.

## D. The Motion to Disband the Committee

■ On November 16, 1994, the debtor filed its motion to disband the Committee. The debtor had long contended that the Committee was incapable of performing its fiduciary duties toward its constituency, and had pressed the United States Trustee to reconstitute it. On June 8, 1994, Berlack wrote a long letter to the United States

---

18. At the final fee hearing, Mr. Weisfelner reiterated what he had said often in the past: it was never his preference or desire to prosecute the contempt motion. (Fee Tr. at 30.)

Trustee arguing that the actual Committee members were ignorant of the case, having delegated their fiduciary duties to their attorneys. These attorneys had various conflicts with their own clients as well as the creditor class. The debtor could not negotiate with them. Further, the Committee had taken wasteful actions, like opposing the appointment of an examiner. At a minimum, the debtor requested that Mr. Levy be removed as a representative.

Despite the letter, the United States Trustee did not reconstitute the Committee. Accordingly, Berlack circulated a draft disbandment motion in early September, 1994. On October 18, 1994, the United States Trustee filed a motion to expand the powers of the former examiner, Thomas Mayer, or appoint a new examiner to investigate the debtor's charges. On November 11, 1994, Berlack filed a limited objection to the United States Trustee's motion, arguing that cause already existed to reconstitute the Committee, and a further investigation was unnecessary. When the United States Trustee agreed, at the aforementioned November 14, 1994 conference, to adjourn the motion *sine die,* Berlack filed its own motion two days later.

While the debtor's disbandment motion is another prong of its attack on the Committee and the tort lawyers, this one is more to the point. The debtor had established through depositions that the two individual Committee members never participated in Committee business, and had deferred these matters to their attorneys, one of whom happened to be Mr. Levy. Although it may have been naive for anyone to assume that these members would have participated personally, the fact remains that they did not even keep informed about the Committee's work. Further, the United States Trustee, who obviously did not share the debtor's animus toward the Committee or the lawyers, was sufficiently concerned about the issues raised to request the appointment of an examiner. Accordingly, I decline to disallow any fees incurred by Berlack in connection with this matter.

**E. Previously Disallowed Fees**

Berlack asks me to reconsider $80,981.70 of fees that I disallowed in connection with their first interim fee application. This sum includes $13,000.00 attributable to the Levy contempt motion. I have already addressed these fees, and to avoid double counting, will ignore them. Hence, the net amount of previously disallowed fees is $68,000.00.

■ The sum of $16,000.00 relates to inadequate substantiation which Berlack has now cured, and these sums are allowed. The balance of the disallowed time falls into two categories: (1) overstaffing, and (2) duplication of effort between Berlack and its then co-counsel, Gainsburg & Hirsch. According to Berlack, the overstaffing pertains to the number of lawyers and paralegals that attended specific court hearings and interoffice conferences during the first interim period. Four lawyers and one paralegal attended the December 6, 1993 TRO hearing, three lawyers and one paralegal attended the preliminary injunction hearings conducted on December 13, 14 and 15, 1993, four lawyers attended a hearing on January 10, 1994, and five lawyers and one paralegal attended internal, interoffice meetings on three different days. According to Berlack, these services generated $24,684.50 in billable time.

Berlack's current time records do not indicate the overstaffing to the degree that concerned me at the time of the interim fee hearing. In addition, the practice of holding "team meetings" did not persist as the case progressed, and it may be that at the early stages of a large chapter 11, such meetings are appropriate. Consequently, these sums will also be allowed.

The remaining disallowed time relates to the duplication of work with Gainsburg & Hirsch and the unreasonable amount of time expended during the first few days of the case on administrative matters such as first day orders. The debtor did not operate and none of its affiliates filed. As a non-operating, single debtor, it did not require the usual panoply of first day orders, nor did it present any cash collateral orders or requests for immediate debtor in possession financing. The only orders it had to present covered retention of professionals. Yet the two firms

billed substantial fees working on "first day orders." Berlack has not shed any fresh light or new perspective that would cause me to reconsider these fees, and I decline to do so. Accordingly, of the net $68,000.00 of previously disallowed fees, $41,000.00 will be allowed and $27,000.00 will be disallowed.

## F. Expenses

Berlack seeks reimbursement of expenses in the sum of $672,139.68. According to its records, $70,570.37 pertains to the Keene 27 matter, $7,333.42 to the contempt motion, and $1,202.06 to the Rule 2019 motion. I have disallowed substantial portions of the fees sought in these categories because the services were unnecessary, and logic dictates that I also disallow the corresponding expenses.

I cannot conceive of any fair way to do this except to disallow the same percentage of expenses in each category. For example, I disallowed 79.52% of the fees sought for the Keene 27 services, and this percentage corresponds to $56,119.53 in expenses that will be disallowed. Since, however, the expenses sought in connection with the Rule 2019 motion are de minimis, I will not disallow any portion.

The contempt motion was billed inaccurately. The specific category reflects $22,-423.00 in billed services, but Ms. Fern's affidavit states that the debtor actually billed $184,014.50, all of which has been disallowed. The $22,423.00 represents only 12.19% of the actual services billed—the balance being billed to other categories. I assume that the $7,333.42 also represents 12.19% of the actual expenses. That means the total expenses in the sum of $60,181.76 should also be disallowed.

## II  MARCUS FEE APPLICATION

### A.  The Examiner Motion

Shortly after this case was filed, the debtor moved for the appointment of an examiner to investigate certain fraudulent transfer claims. The background and reasons for granting the debtor's motion are described in *Keene Corp. v. Coleman (In re Keene Corp.),*

164 B.R. 844 (Bankr.S.D.N.Y.1994). In brief, during the 1980s, the debtor sold or spun off certain operating divisions, transferring over $200 million in assets to its affiliates. *Id.* at 846–47. Prior to the petition date, these transfers were challenged in approximately 1600 lawsuits, including two class actions filed in the United States District Courts for the Southern District of New York and the Eastern District of New York. *Id.* at 847–48. The two class actions, which were substantially similar, named many of the debtor's present and former officers, directors and shareholders as defendants, and sought either to set aside the transfers as fraudulent or to declare that certain other entities were liable for all of the debtor's debts. *Id.*

The debtor sought an injunction against the continued prosecution of these lawsuits, and the appointment of an examiner to investigate the claims. As to the latter, the debtor did not concede that the claims were meritorious; rather, the debtor recognized that its own investigation would be questioned since the debtor's insiders were named in these suits. *Id.* at 854 n. 7. What should have been a *pro forma* motion met with strenuous objection from the Committee. The Committee challenged the debtor's standing to make the motion, and also argued that the appointment of an examiner was made in bad faith and would be unduly expensive. *Id.* at 855. I overruled the Committee's objections, and appointed an examiner with a $100,000.00 budget. *Id.* at 857–58.

The Committee appealed from that order. The United States Trustee subsequently nominated Thomas Moers Mayer, Esq., and submitted an application for approval of the appointment to the Court. *See* Federal Bankruptcy Rule 2007.1(b). I raised the issue of whether the appeal divested me of jurisdiction to approve the appointment, but following briefing by the parties, concluded that it did not. *Keene Corp. v. Coleman (In re Keene Corp.),* 166 B.R. 31, 35–36 (Bankr. S.D.N.Y.1994). I approved Mr. Mayer's appointment, and with the assistance of his law firm, he produced a comprehensive 185 page report.[19] The Committee continued to prose-

---

19.  *See Preliminary Report of Examiner Thomas*     *Moers Mayer,* dated July 18, 1994 ("Examiner's

cute its appeal throughout, and did not withdraw the appeal until November, 1994.

During these proceedings and the various interim fee application hearings, I questioned the reason for the Committee's opposition, and have, after all this time, been unable to understand its justification.[20] The Committee frequently characterized the debtor's motion as an expensive delaying tactic. Yet the underlying prepetition fraudulent transfer claims were stayed, *In re Keene Corp.,* 164 B.R. at 854, and the Committee had done nothing to take over their prosecution. Moreover, the Committee's opposition implied that if the examiner concluded that the claims lacked merit, they would magically disappear from the case. *Id.* at 857. In that event, the claims could still be prosecuted by the Committee under *In re S.T.N. Enters.,* 779 F.2d 901 (2d Cir.1985), or the debtor could be compelled to abandon the claims in which case the creditors could prosecute the claims. *See In re Keene Corp.,* 164 B.R. at 857.

The Committee's opposition may have sprung from a desire to prosecute the claims itself, despite substantial statute of limitations problems, on the estate's "dime." *See id.* If the examiner concluded that the claims lacked merit, the Committee might have to prosecute the claims on a contingency fee basis. *Id.* Or an examiner might (and in this case did) recommend that the Court invite potential estate representatives to "bid" for the right to prosecute the claims; the increased competition might produce a more favorable fee structure for the estate, but lock out the Committee in the process. The Committee, controlled by the plaintiffs' bar, was so intent on prosecuting these

claims that Committee counsel represented to the Court that the plaintiffs' bar would not agree to any plan that did not permit the plaintiffs' lawyers to proceed with the claims. *Id.*

In the end, the Committee's strenuous opposition may have been based on the principle that if the debtor wants the examiner, it must be bad for creditors. Whatever the Committee's motivations, Marcus has failed to carry their burden of proof to establish that the legal fees and expenses incurred in fighting the examiner appointment were reasonable or necessary. Neither the debtor's motion nor the appointment of the examiner delayed the prosecution of the fraudulent conveyance actions because they were subject to the automatic stay. The examiner would be called upon to investigate the relative merits of the fraudulent conveyance claims—work someone had to perform—and even if he concluded that the claims lacked merit to warrant prosecution at the estate's expense, the Committee could still seek to prosecute the claims at its own expense or on a contingency fee basis. Further, after the examiner's report was actually completed and submitted, the Committee used it as a "preliminary road map" in drafting its own complaint. *Final Application of Marcus Montgomery P.C. For Award of Compensation and Reimbursement of Expenses as Counsel to the Official Committee of Unsecured Creditors,* dated Sept. 16, 1996, at ¶ 112.

I find that it was unreasonable to view the examiner motion as a delay tactic at the time that it was made. I conclude, therefore, that the fees and expenses incurred in opposing the motion were not reasonably contemplated

---

Rep."). Though hamstrung by a tight budget and short time constraints, the examiner concluded that the transactions "were motivated *at least in part* by an intent to hinder, delay or defraud creditors." (*Id.* at 4) (emphasis in original.) Nevertheless, he pointed out potential statute of limitations problems (*Id.* at 6–8.) The examiner recommended that the parties be invited to nominate counsel whose fees could be paid on a "substantial contribution" basis and subject to an hourly cap. (*Id.* at 22.)

**20.** The Committee's final fee hearing submission, indicates that its opposition was designed to send a message to Mr. Bailey and the debtor. In

addition to increased delay and expense, the Committee feared that appointing an examiner would "give Bailey (and thus the Debtor) a psychologically important legal victory at the beginning of the case." Letter of John J. Preefer, Esq., dated Oct. 28, 1996, at 4. In addition, the Committee's appeal served the "strategic purpose" of showing the debtor, early in the case, that the Committee would not "roll over" for the debtor. *Id.* at 5. None of these reasons justify charging the creditors. They are merely the "flip side" of the historic animosity between Mr. Bailey and the plaintiffs' bar.

to confer a benefit on the estate. Accordingly, these fees and expenses are disallowed. The Marcus firm recorded all of the examiner issues under one billing subcategory no. 006, and the amount that relates to the claims examiner (as opposed to the plan examiner) totals approximately $150,000.00. Some of this time is, however, compensable. Marcus expended services with an approximate value of $330.00 communicating with the United States Trustee's Office regarding potential candidates, $90.00 reviewing the proposed appointment order and the affidavit of disinterestedness submitted by Mr. Mayer and his firm, and $2,500.00 addressing questions relating to the disinterestedness of Mr. Mayer and his firm. The balance, $147,000.00, will be disallowed. In addition, my review of Marcus' daily expense records for this matter indicates that approximately $7,000.00 in disbursements corresponds to the disallowed time, and this, too, will be disallowed.

## B. Fraudulent Conveyance Litigation

On June 9, 1995, the Committee filed a 334 paragraph, 117 page complaint relating to the spin off of the debtor's operating divisions during the 1980s. These same claims were the subject of Mr. Mayer's report. Twenty one lawyers and paraprofessionals billed $644,786.50 in time and $46,046.01 in expenses to this project. Most of the billable time—accounting for $488,905.50—was expended during the eight month period beginning February 1, 1995 and ending September 30, 1995. The United States Trustee has identified this category of services as an area of concern. In particular, the United States Trustee points out that Mr. Mayer and his firm had already investigated the fraudulent conveyance claims, expending approximately $275,000 in time.

Neither the United States Trustee nor any other party takes issue with the necessity of the Marcus firm's work in this area. The "spin off" claims are potentially the most significant asset transferred to the Creditor's Trust. Mr. Mayer, operating on a limited

budget,[21] found some of the claims viable but noted potentially serious statute of limitations defenses to at least some of the transfers. Similarly, no one has argued that the Marcus firm did not actually render the services. Thus, the only question concerns the reasonableness of the amount of time expended. This is the substance of the United States Trustee's objection.

While I had the same initial reaction as the United States Trustee to this portion of the request, my examination satisfies me that the vast majority of the services are reasonable. First, Mr. Mayer concededly operated on a tight budget, and had to forego much of the time consuming factual analysis which a successful prosecution required. In particular, in addition to the many financial and solvency issues with which Mr. Mayer did not deal, the Marcus firm also had to concern itself in greater depth with the statute of limitations issues. On the other hand, the Marcus firm did relatively little pure legal research prior to filing the complaint. During the six months preceding June 1995, Marcus billed approximately $70,000.00 to legal research on the fraudulent conveyance issues.

Second, Mr. Mayer did not draft a complaint. Again, during the six month period preceding the filing of the complaint, Marcus lawyers billed approximately $110,000.00 to this endeavor. Further, Marcus had to seek permission to file the complaint, and after the complaint was filed, Marcus had to address numerous discovery issues and motions. Thus, it would not be fair to judge the reasonableness of Marcus' fees by comparing them with Mr. Mayer's fees; that would be comparing apples to oranges.

■■■■ On the other hand, I am compelled to conclude that the Marcus fees are inflated to some degree as a result of overstaffing. For example, eleven lawyers worked on drafting, reviewing and redrafting the complaint. Similarly, eleven lawyers worked on the fraudulent conveyance research during the first half of 1995. Just as Michelangelo should not charge Sistine Chapel rates to paint a barn, *In re S.T.N. Enters., Inc.,* 70

---

21. The Court budgeted $100,000.00 for the examiner's work. Mr. Mayer and his firm expended nearly $275,000.00 in time, but still requested only $100,000.00, although they had the right to petition to increase the budget.

B.R. 823, 842 (Bankr.D.Vt.1987), he should not employ the entire Florentine school on the project. Overstaffing necessarily contributes to duplication of effort and learning curve costs, and the Marcus time records do not reflect that anyone operated in such a unique niche that using eleven different lawyers for either project made sense. In addition, Marcus staffed this matter with over twenty professionals and paraprofessionals, and this contributed to the high cost of this matter. Accordingly, the Court will reduce the request by $50,000.00 to reflect the overstaffing on this matter. Since I cannot conclude that there were corresponding expenses which were unnecessarily incurred in an otherwise valid project, there will be no reduction in the award of expenses pertaining to this category.

## III  RECAPITULATION

The disallowed fees and expenses are as follows:

| APPLICANT | DISALLOWED FEES | DISALLOWED EXPENSES |
| --- | --- | --- |
| Berlack | $ 607,946.50 | $ 116,301.29 |
| Marcus | $ 197,000.00 | $ 7,000.00 |

The balance of the requests are allowed.

Settle Order on notice.