**In re Howard M. BEZOZA, Debtor.**

**No. 01 B 16278(SMB).**

United States Bankruptcy Court,
S.D. New York.

Jan. 3, 2002.

---

Ira L. Herman, Jennifer D. Marcell, Robinson Silverman Pearce, Aronsohn & Berman LLP, New York City, for Debtor.

## MEMORANDUM DECISION AND ORDER DENYING MOTION TO ENFORCE THE AUTOMATIC STAY

STUART M. BERNSTEIN, Chief Judge.

The debtor is presently in jail, pursuant to an order of contempt, based on his failure to pay spousal and child support. After filing this chapter 11 petition, he

made a motion seeking various forms of relief, all posited on the premise that his continuing confinement violated the automatic stay. I denied his application from the bench, and this memorandum amplifies my decision.

## BACKGROUND [1]

The debtor, Howard M. Bezoza, is a medical doctor. He was formerly married to Linda Blau Bezoza ("Linda"), and the couple have three daughters who range in age from approximately nine to seventeen years. (*See Decision* 9.) The debtor and Linda entered into a Property Settlement Agreement ("PSA") on September 2, 1998. (*Id.* at 76.) They were divorced by judgment of the Superior Court of the State of New Jersey on November 9, 1999, and the PSA was incorporated in the divorce judgment. (*Id.*) The judgment required the debtor to pay weekly spousal support in the sum of $923.08, and the identical amount in weekly child support. In addition, the PSA required the debtor to pay "add-on" expenses. (*Id.*) The New Jersey divorce judgment also included a money judgment in the amount of $563,435.00 against the debtor based upon unpaid support, "add-on" and other expenses.[2] (*Id.* at 76–77.)

Linda subsequently registered the New Jersey support order in New York, and commenced proceedings to enforce it. The Hearing Examiner conducted several days of evidentiary hearings, and heard the testimony of the debtor, Linda and the debtor's father, Nathan. The evidence disclosed that the debtor had little money in his own name. Nevertheless, he managed to maintain an extravagant life style using corporate credit cards, funds liberally provided by corporate affiliates and his father, and trust funds taken from his daughters custodial bank accounts. The debtor operated through a professional corporation, or PC. (*See id.* at 56–57.) According to his PC's 1996 tax return,[3] the practice generated over $2 million in fees. (*Decision* at 80.) In addition, the few business bank statements he produced covering the relevant period showed "high five-figure deposits." (*Id.*)

The debtor also operated several other medical entities. He owned and apparently practiced medicine through the 57th Street Vitamin Dispensary. In September 1998, he sold the inventory for $133,000.00 and the practice for $1,533,000.00 to Vitality Centers, Inc.[4] (*Id.* at 19–21.) He and his professional corporation continued as employees of Vitality, (*id.* at 20), he received salary of $20,000.00 per month for a time, (*id.* at 31), but after Vitality paid only $200,000.00 against the purchase price, it terminated the deal in March 1999. (*Id.* at 21.)

A company called PDI was then incorporated, apparently to continue the business formerly operated by the debtor and sold to Vitality. The debtor testified that he

---

1. The discussion that follows is derived primarily from the 88 page Decision and Findings of Fact, dated May 11, 2001 (*"Decision"*), issued by Nicholas J. Palos, the Hearing Examiner appointed by the New York Family Court.

2. The Hearing Examiner concluded that the support-related expenses accounted for $491,644.10 of the money judgment. (*Decision* at 77.)

3. Based upon the list of exhibits introduced into evidence at the hearing, the PC last filed an income tax return for the 1997 tax year. (*See Decision* at 73.)

4. The debtor also testified about the sale of an entity he identified as the 57th Street Wellness Center to Vitality. (*See Decision* at 56.) This may be the same as the 57th Street Vitamin Dispensary.

was not a shareholder[5], (*id.* at 34), but PDI paid the debtor's PC weekly rent of $1,000.00. (*Id.* at 28.) The debtor could write checks of up to $2,500.00 on the PDI bank account to pay PDI business expenses, but he also cut PDI checks when his practice needed money, (*id.* at 34–35), he used the PDI corporate Optima card to buy inventory, (*id.*), and used the PDI corporate credit card to pay personal expenses as well. (*Id.* at 28.)[6] In addition, the debtor controlled the PDI Membership Account, (*id.* at 56), which contained the fees from some sort of pre-paid medical plan. (*Id.* at 66.) The program had no more than nine members, and the funds were drained by November 1999. (*Id.*)

The debtor also received substantial sums from his father, amounts he characterized as loans. (*Id.* at 59–60.) Nathan paid his legal bills, provided $50,000.00 in December 1999 to bring his office rent up to date, gave him $15,000.00 during the summer of 1999 to rent a house with Ms. Ash, and paid $10,000.00 to obtain his release from jail. In addition, his father deposited an unspecified amount in the debtor's business account in February 1999. (*Id.* at 32.) The debtor claimed he owed his father $130,000.00. (*Id.* at 60.)

According to his testimony, he repaid his father, and then some, through the sale of his interest in a family real estate partnership, White Street Associates ("WSA"). In January 2000, he transferred his interest for $430,000.00, but received no proceeds. Instead, Nathan received all of the proceeds. In exchange, he canceled the debtor's $130,000.00 loan, and delivered a $300,000.00 note, payable in quarterly installments of $25,000.00.[7] (*Id.* at 60, 69.) Nathan paid the first $25,000.00 installment in May 2000, and the debtor endorsed the payment to Karen Ash. (*Id.* at 44.)[8] He received only one other quarterly payment, and the loan appears to be in default. (*Id.* at 63.)

Aside from his father and the corporate affiliates, the debtor took liberally from his minor daughters. In January 1999, he raided his daughter Michelle's custodial account and appropriated over $103,000.00 for himself. (*Id.* at 52.) In March 1999, he emptied $14,200.00 from his daughter Tori's custodial account. (*Id.* at 32, 52.) He eventually closed his personal account in October 1999 because he ran out of money, but was unable to explain where he had invested his daughters' trust money. (*Id.* at 52.)

5. According to the debtor, the three shareholders of PDI were Joseph Filardo, Douglas Filardo and the debtor's father, Nathan. (*Decision* at 34.) The debtor also testified that Nathan was the largest shareholder because his Certificate of Deposit was used to collateralize PDI's start up loan. (*Id.* at 56.) Nathan denied any interest or involvement in PDI, (*id.* 69), and testified that he never provided start up funds to PDI, or collateralized any loan. (*Id.* at 72.)

6. For example, he used the corporate credit card to travel with his girlfriend, Karen Ash, to Paradise Island, where they stayed at the Atlantis Hotel, in November 1999, and to Palm Beach, where they stayed at the Ritz–Carlton Hotel, in February 2000. (*Decision* at 48–49.)

7. Nathan testified that the debtor's interest was worth between $700,000.00 and $800,000.00, but the purchase price was set at what the debtor "would take for the interest." (*Id.* at 69.)

8. This was not the only time the debtor deposited his own funds in Ms. Ash's account. He cashed out his IRA for approximately $90,000.00, and deposited the proceeds in her account. (*Decision* at 32.) He may have used these sums to cure the mortgage defaults on the marital home. (*Id.* at 64.) He deposited another $9,500.00 in her account in September 1999, (*id.* at 33), and may have deposited additional sums to repay loans made by her parents. (*Id.*)

At the conclusion of the hearing, the Hearing Examiner concluded that the debtor was able to pay his support obligations but wilfully failed to do so. (*Id.* at 1.) He described the debtor as a "pampered physician" who used corporate credit cards to travel with his girlfriend to the Bahamas (at a cost of $5,000.00) at a time when he was claiming poverty because he was caring for his terminally ill mother and was unable to work. (*Id.* at 79.) The Hearing Examiner discounted the debtor's "claims of poverty," observing that the debtor "has lead a lifestyle which apparently is designed to fulfill his whims no matter who else must suffer, be it his landlord, the taxpayers of the United States and the State of New York or even his ex-wife and children." (*Id.* at 79–80.)

Aside from the debtor's trial testimony, which the Hearing Examiner called "unreliable," the debtor failed to offer any evidence regarding his own financial condition. (*Id.* at 80.) The debtor had not filed income tax returns for several years, and "knowingly avoided producing any documentation which may be used to demonstrate his current financial condition." (*Id.*) Yet the earlier records showed that his PC generated substantial income. (*Id.*) "Simply put, the [debtor's] cries of poverty are not credible. He had, or could obtain the means to meet his obligation to his family." (*Id.* at 80–81.)

The findings resulted in the imposition of several monetary and non-monetary sanctions. The former included the entry of a money judgment for the unpaid amounts not already part of the New Jersey judgment,[9] (*id.* at 83), the entry of a

judgment in the sum of $46,644.21 as counsel fees payable directly to Linda's attorney, (*id.* at 87–88), the posting of a bond in the amount of $95,000.00 to secure the payment of one year of support obligations, (*id.* at 84 n. 5), and the appointment of a receiver for his medical practice and PDI. (*Id.* at 84.) The non-monetary sanctions included the revocation of the debtor's driving privileges, the revocation of the debtor's medical license (stayed until August 31, 2001), and the return of his passport to the State Department (effectively revoking it). (*Id.* at 85–86.)

Finally, the Hearing Examiner made a non-binding recommendation of imprisonment for contempt of court. He suggested that the debtor serve six months, but upon payment of $200,000.00, he could be released from custody, and permitted to serve the balance of his sentence on weekends. If he purged himself by full payment, "the requirement for incarceration may be dropped." (*Id.* at 87.) The Family Court Judge accepted the recommendation, and by order dated May 29, 2001, committed the debtor to the custody of the New York City Department of Corrections for the term and under the conditions proposed by the Hearing Examiner.

The debtor filed a timely notice of appeal, and moved for an interim stay of the Order of Commitment. The Appellate Division granted the motion on the condition that the debtor pay $100,000.00 by certified check as well as current child support to Linda's attorney. Finding that the debtor had complied with the conditions, the Appellate Division ordered his release

---

9. Following the entry of the divorce decree, the debtor accrued additional support obligations of $140,308.16, and additional add-on expenses of $79,179.26. (*Decision* at 77.) After deducting payments made by or on behalf of the debtor, the Hearing Examiner found that the debtor still owed $547,527.40 in child support, spousal support and add-on expenses. (*Id.* at 1.) The Hearing Examiner declined to enter an immediate income deduction order because the debtor was a self-employed physician who "controls his own checkbook." (*Id.* at 83.)

upon the conditions set forth, and upon the additional condition that he perfect his appeal by the November 2001 term. After the debtor failed to pay all of mandated support or perfect his appeal by the November 2001 term, the Appellate Division, on Linda's motion, vacated the stay of incarceration. The debtor was rearrested on December 13, 2001. He filed this chapter 11 petition on December 17, 2001, and remains in custody. (*Motion in Support of Order to Show Cause*, filed Dec. 20, 2001, ¶¶ 8–16.)

## DISCUSSION

■ The primary issue before me is whether the debtor's continued imprisonment violates the automatic stay. As a rule, the commencement of a case under title 11 stays all actions and proceedings to collect pre-petition claims, 11 U.S.C. § 362(a)(1), or obtain possession or control over property of the estate. 11 U.S.C. § 362(a)(3). However, pre-petition alimony, maintenance and support (*i.e.*, spousal and child support) are not dischargeable, 11 U.S.C. § 523(a)(5), and the stay does not apply to actions to collect non-dischargeable support from non-estate property. 11 U.S.C § 362(b)(2)(B).

■ Without question, the debtor's confinement is intended to coerce him to pay the support-related debts imposed under the PSA, the New Jersey judgment and the New York judgment.[10] Although he was sentenced to a specific term, he could limit his sentence to weekends if he paid $200,000.00, and avoid confinement entirely if he paid all of his support obligations in full. The contempt is, therefore, civil in nature, see *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 168 B.R. 285, 288 (Bankr.S.D.N.Y.1994)(coercive civil con-

tempt imposes sanctions to compel compliance with court orders that benefit a party), *appeal dismissed,* 182 B.R. 379 (S.D.N.Y.1995), and under ordinary circumstances, would violate the automatic stay. If a creditor cannot collect a debt from property of the estate, she cannot force a debtor, through civil contempt, to turnover property of the estate to pay that debt. See *In re Maloney,* 204 B.R. 671, 674 (Bankr.E.D.N.Y.1996)(Swain, J.)

■ As noted, however, the stay does not apply to the collection of support obligations from non-estate property. Hence, the use of contempt is similarly permissible in those circumstances. Thus, while the automatic stay prevents a support creditor from using civil contempt to recover pre-petition support from property of the estate, see *In re Kearns,* 168 B.R. 423, 426 (D.Kan.1994); *In re Rook,* 102 B.R. 490, 494 (Bankr.E.D.Va.1989), *aff'd,* 929 F.2d 694, 1991 WL 42446 (4th Cir. 1991), it does not prohibit the use of any collection remedies, including contempt, to satisfy the support debt from non-estate property. *In re Moon,* 211 B.R. 483, 486 (S.D.N.Y.1997); *Altchek v. Altchek (In re Altchek),* 124 B.R. 944, 959 (Bankr. S.D.N.Y.1991); *see In re Newman,* 196 B.R. 700, 704 (Bankr.S.D.N.Y.1996). The burden of proof falls on the debtor as the proponent of the motion.

■ While it is tempting to infer that Linda must be pursuing property of the estate in light of its broad, inclusive definition, *see* 11 U.S.C. § 541(a), I conclude that the debtor has failed to sustain his burden of proof. Under § 454(3) of New York's Family Court Act, the court may commit a delinquent support debtor to jail "[u]pon a finding by the court that a re-

---

**10.** The debtor, in this regard, has not argued that the vast majority of the debts encompassed within the PSA and court judgments are anything other than spousal and child support under the Bankruptcy Code.

spondent has wilfully failed to obey any lawful order of support." "Wilfullness requires proof of both the ability to pay and the failure to do so." *Powers v. Powers,* 86 N.Y.2d 63, 629 N.Y.S.2d 984, 653 N.E.2d 1154, 1157 (1995). The petitioner makes out her *prima facie* case under § 454(3) by demonstrating that the respondent failed to pay the court-ordered support, and the burden then shifts to the respondent to show that he is financially unable to pay. *Id.; see* Fam. Ct. Act. §§ 454(3)(a), 455(5).

The rules used to determine a respondent's ability to pay under § 454(3) are the same as those used to determine the initial support order under Family Court Act §§ 442 (spousal support) and 443 (child support). Douglas J. Besharov, PRACTICE COMMENTARIES, Book 29A Jud. Ct. Acts–Part 1, at 544 (McKinney 1999)("PRACTICE COMMENTARIES"). The debtor spouse, generally the husband and father, is obligated to use his assets and earning power to maintain the marital standard of living. *Hickland v. Hickland,* 39 N.Y.2d 1, 382 N.Y.S.2d 475, 346 N.E.2d 243, 246 (1976), *cert. denied,* 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976). A court, in fixing support or judging the ability to pay, is not limited to property rights enforceable under traditional concepts of property and contract law, *see Blickstein v. Blickstein,* 99 A.D.2d 287, 472 N.Y.S.2d 110, 115 (N.Y.App.Div.1984); *Rush v. Rush,* 152 Misc.2d 823, 579 N.Y.S.2d 552, 555–56 (N.Y.Fam.Ct.1991)(Gallet, J.), and may consider financial resources that would not be available to creditors either inside or outside of bankruptcy. In addition to what the support debtor actually earns and owns, the court may weigh what he is capable of earning in light of his education and opportunities, *Kay v. Kay,* 37 N.Y.2d 632, 376 N.Y.S.2d 443, 339 N.E.2d 143, 146

(1975); *see Hickland,* 382 N.Y.S.2d 475, 346 N.E.2d at 245 (court may disregard decrease in earnings where "the husband . . . deliberately stripped himself of income for reasons which went beyond the needs of a reasonable occupational choice"); *Dorner v. McCarroll,* 271 A.D.2d 530, 705 N.Y.S.2d 408, 409 (N.Y.App.Div.2000)("the ability to pay support also includes the ability to find employment"), the availability of trust income and corpus, *Scheuer v. Scheuer,* 144 A.D.2d 225, 534 N.Y.S.2d 537, 537 (N.Y.App.Div.1988); *Rush,* 579 N.Y.S.2d at 555; *see Chapman v. Chapman,* 28 A.D.2d 1028, 283 N.Y.S.2d 782, 782 (N.Y.App.Div.1967), the availability of gifts, *Blickstein,* 472 N.Y.S.2d at 115; *Rush,* 579 N.Y.S.2d at 555, and the resources of the non-custodial spouse's live-in paramour or spouse. *Farley v. Farley,* 114 A.D.2d 703, 494 N.Y.S.2d 546, 547 (N.Y.App.Div.1985); *Rush,* 579 N.Y.S.2d at 555; *Felisa L. v. Allen M.,* 107 Misc.2d 217, 433 N.Y.S.2d 715, 717 (N.Y.Fam.Ct. 1980)(Kram, J.); *cf.* PRACTICE COMMENTARIES 442–43 (although a court may not treat the income of the non-custodial parent's new spouse as an increment to his own means, the court may consider whether the additional income reduces the non-custodial parent's other expenses, and hence, should affect his support obligation).

The Hearing Examiner determined that the debtor was able to pay his support obligations. That decision is not subject to review in this Court. Nevertheless, I must ascertain whether the Hearing Examiner's conclusion was based upon the availability of resources that, after the bankruptcy petition was filed, became property of the debtor's estate. If so, then the debtor's continued confinement would have the effect of coercing him to use property of the estate to pay pre-petition support obligations in violation of 11 U.S.C. § 362(a).

The Hearing Examiner's decision shows that this is not the case. In fact, with the possible exception of the right to payment on the WSA notes,[11] the prior proceedings failed to identify any property of the estate owned by the debtor and implicated by the Hearing Examiner's decision. The debtor insulated his resources and lived an extravagant life style by practicing medicine through a PC, and paying numerous personal expenses with funds or credit provided by the PC, PDI, and Nathan, and these resources do not constitute property of the estate. Even personal funds deposited in Karen Ash's account are not property of the debtor's estate. *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir.1992)(fraudulently transferred property is not property of the estate).

Bankruptcy law does not prohibit the debtor from using non-estate property, or being forced to use non-estate property, to pay his pre-petition support obligations.[12] At oral argument, the debtor's attorney urged me to ignore the corporate niceties and protect these assets. The debtor, however, created a financial structure that insulated his resources from his creditors. There is no reason to disturb that structure, at least at the debtor's insistence, given the circumstances under which he insists.

**The Receiver**

■ The debtor also seeks a determination that the continued activities of the receiver appointed by the state court violate 11 U.S.C. § 362(a)(3). Pursuant to 11 U.S.C. §§ 543, a custodian, which includes a pre-petition receiver, *see* 11 U.S.C. § 101(11)(A); *In re 245 Assocs., LLC*, 188 B.R. 743, 748 (Bankr.S.D.N.Y.1995), must abstain from taking action with respect to property of the debtor or the estate or the proceeds of that property, turnover the property to the trustee and file an accounting.[13] The debtor did not provide a copy of the receiver's order, and hence, it is not possible to determine the receiver's actual duties. Nevertheless, the Hearing Examiner directed the appointment of the receiver for the property of the PC and PDI rather than the debtor. While the provisions of § 543, like the automatic stay, are

11. Although not raised in the debtor's motion, the right to receive the proceeds of the WSA notes may constitute property of the estate depending on whether the debtor or some affiliated non-debtor entity is the payee. Accordingly, the collection of the proceeds may subject Linda and her attorneys to liability under 11 U.S.C. § 362(h). Given the complex financial transactions, the misappropriation of the custodial accounts and the many transfers between and among the debtor, his father, Karen Ash, and possibly, Ms. Ash's parents, the United States Trustee might want to consider moving for the appointment of an operating trustee.

12. Even if the debtor by-passes his PC and earns income personally from his medical practice in the future, the income derived from his personal services will not be property of the estate. *See* 11 U.S.C. § 541(a)(6).

13. Section 543(a) and (b) state:

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

self-enforcing, the debtor has not shown that the receiver's appointment or actions implicate either provision.

## CONCLUSION

The debtor has failed to show that his continued incarceration is intended to force him to use property of the estate to pay his pre-petition support obligations, or that the receiver's activities are affected by §§ 362 or 543. Accordingly, his application is denied.

SO ORDERED.